# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued January 15, 2020          Decided April 7, 2020

No. 19-5322

IN RE: FEDERAL BUREAU OF PRISONS' EXECUTION PROTOCOL CASES,

JAMES H. ROANE, JR., ET AL.,
APPELLEES

v.

WILLIAM P. BARR, ATTORNEY GENERAL, ET AL.,
APPELLANTS

————

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-mc-00145)

————

*Melissa N. Patterson*, Attorney, U.S. Department of Justice, argued the cause for appellants. With her on the briefs were *Joseph H. Hunt*, Assistant Attorney General, *Jessie K. Liu*, U.S. Attorney, *Hashim M. Mooppan*, Deputy Assistant Attorney General, *Paul R. Perkins*, Special Counsel, and *Mark B. Stern*, Attorney.

*Catherine E. Stetson* argued the cause for appellees. With her on the brief were *Sundeep Iyer*, *Pieter Van Tol*, *Joshua M. Koppel*, *Arin Smith*, *Jon Jeffress*, *Alan E. Schoenfeld*,

2

*Stephanie Simon*, and *Shawn Nolan*, Assistant Federal Public Defender.

Before: TATEL, KATSAS, and RAO, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

Concurring opinion filed by *Circuit Judge* KATSAS.

Concurring opinion filed by *Circuit Judge* RAO.

Dissenting opinion filed by *Circuit Judge* TATEL.

PER CURIAM:  The Federal Death Penalty Act of 1994 (FDPA) requires federal executions to be implemented "in the manner prescribed by the law of the State in which the sentence is imposed."  18 U.S.C. § 3596(a).  It is common ground that this provision requires the federal government to adhere at least to a State's choice among execution methods such as hanging, electrocution, or lethal injection.  The district court held that the FDPA also requires the federal government to follow all the subsidiary details set forth in state execution protocols—such as, in the case of lethal injection, the method of inserting an intravenous catheter.  On that basis, the court preliminarily enjoined four federal executions.

Each member of the panel takes a different view of what the FDPA requires.  Because two of us believe that the district court misconstrued the FDPA, we vacate the preliminary injunction.

3

I

A

On three different occasions, Congress has addressed the "manner" of implementing the death penalty for federal capital offenses.  In the Crimes Act of 1790, the First Congress specified that "the manner of inflicting the punishment of death, shall be by hanging the person convicted by the neck until dead."  Crimes Act of 1790, ch. 9, § 33, 1 Stat. 112, 119. This provision governed federal executions for over 140 years.

In 1937, Congress changed this rule to make the "manner" of federal executions follow state law.  Specifically, Congress provided:

> The manner of inflicting the punishment of death shall be the manner prescribed by the laws of the State within which the sentence is imposed.  The United States marshal charged with the execution of the sentence may use available State or local facilities and the services of an appropriate State or local official or employ some other person for such purpose ….  If the laws of the State within which sentence is imposed make no provision for the infliction of the penalty of death, then the court shall designate some other State in which such sentence shall be executed in the manner prescribed by the laws thereof.

An Act To Provide for the Manner of Inflicting the Punishment of Death, Pub. L. No. 75-156, 50 Stat. 304 (1937).  Congress repealed this provision in 1984, *see* Sentencing Reform Act of 1984, Pub. L. No. 98-473, § 212, 98 Stat. 1987, but left intact the underlying capital offenses.  Accordingly, federal law still

4

authorized the death penalty, but no federal statute specified how it would be carried out.

To fill this gap, the Attorney General promulgated a 1993 regulation titled "Implementation of Death Sentences in Federal Cases." 58 Fed. Reg. 4898, 4901–02 (Jan. 19, 1993). It provides that, unless a court orders otherwise, the "method of execution" of a federal death sentence shall be "[b]y intravenous injection of a lethal substance or substances in a quantity sufficient to cause death, such substance or substances to be determined by the Director of the Federal Bureau of Prisons." 28 C.F.R. § 26.3(a)(4) (2019). The regulation also addresses various other matters including the time and place of execution, when the prisoner must be notified of the execution, and who may attend it. *Id.* §§ 26.3–26.5.

Congress enacted the FDPA in 1994. Under the FDPA, as under the 1937 statute, the "manner" of implementing federal death sentences turns on state law. In pertinent part, the FDPA provides that a United States marshal

> shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed. If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law.

18 U.S.C. § 3596(a). The FDPA also provides that a marshal overseeing an execution "may use appropriate State or local facilities" and "may use the services of an appropriate State or local official." *Id.* § 3597(a).

5

B

At various times since 2001, the Department of Justice has developed protocols setting forth the precise details for carrying out federal executions.  One such protocol was adopted in 2004 and updated in 2019.  As updated, the protocol "provides specific time related checklists for pre-execution, execution, and post execution procedures, as well as detailed procedures related to the execution process, command center operations, contingency planning, news media procedures, and handling stays, commutations and other delays."  App. 24.  This 50-page document addresses, among other things, witnesses for the execution, the prisoner's final meal and final statement, strapping the prisoner to the gurney, opening and closing the drapes to the execution chamber, injecting the lethal substances, and disposing of the prisoner's body and property.

For the three federal executions conducted between 2001 and 2003, the Bureau of Prisons used a combination of three lethal substances—sodium thiopental, a barbiturate that "induces a deep, comalike unconsciousness when given in the amounts used for lethal injection," *Baze v. Rees*, 553 U.S. 35, 44 (2008) (plurality opinion); pancuronium bromide, which stops breathing; and potassium chloride, which induces cardiac arrest.  None of the three prisoners challenged these procedures.  In 2008, the Bureau memorialized its use of the three substances in an addendum to its 2004 execution protocol, and the Supreme Court held that Kentucky's use of the same three substances for executions did not violate the Eighth Amendment, *see id.* at 44, 63; *id.* at 94 (Thomas, J., concurring in judgment).  But by 2011, a "practical obstacle" to using sodium thiopental had emerged, "as anti-death penalty advocates pressured pharmaceutical companies to refuse to supply the drug" for executions.  *Glossip v. Gross*, 135 S. Ct. 2726, 2733 (2015).

6

The Bureau then explored the possible use of other lethal substances. Its personnel visited state execution sites and evaluated their protocols. BOP also consulted with medical experts, reviewed assessments of difficult executions, and studied relevant judicial decisions. It considered several options, including three-drug protocols using other barbiturates, three-drug protocols using weaker sedatives, and one-drug protocols.

After extensive study, the Bureau recommended use of a single barbiturate—pentobarbital—to carry out federal executions. It noted that many recent state executions had used pentobarbital without difficulty and that courts repeatedly have upheld the constitutionality of its use for executions. Further, BOP had located a "viable source" for obtaining it. App. 15, 19.

For these reasons, the Bureau proposed a two-page addendum to its main execution protocol. The United States Marshals Service concurred in the proposal. On July 24, 2019, the Attorney General approved the addendum and directed the Bureau to adopt it. BOP did so the next day. This 2019 addendum makes pentobarbital the sole lethal substance to be used in federal executions. The addendum also specifies procedural details such as dosage, identification of appropriate injection sites, and the number of backup syringes.

C

This appeal arises from several consolidated cases in which twelve death-row inmates challenge the federal execution protocol. The first of these cases was filed in 2005, by three inmates who are not parties to this appeal. With the government's consent, the district court stayed their executions pending the decision in *Hill v. McDonough*, 547 U.S. 573 (2006). The government subsequently requested that the case

7

be stayed pending the decision in *Baze*. With no objection from the inmates, the district court granted the request. In 2011, the government announced that it lacked the substances necessary to implement its execution protocol. From then through 2019, the consolidated cases were stayed, and the government submitted status reports explaining that its revision of the protocol was ongoing. During that time, one of the plaintiffs involved in this appeal—Alfred Bourgeois—filed a complaint challenging the unrevised protocol. On the parties' joint motion, that lawsuit was stayed pending the revision.

On July 25, 2019, the Department of Justice informed the district court that it had adopted a revised protocol providing for the use of pentobarbital. That same day, DOJ set execution dates for the four plaintiffs involved in this appeal: Daniel Lee, Wesley Purkey, Dustin Honken, and Bourgeois. Each of them moved for a preliminary injunction. Collectively, they claimed that the 2019 protocol and addendum violate the FDPA, the Administrative Procedure Act, the Federal Food, Drug, and Cosmetic Act, the Controlled Substances Act, and the First, Fifth, Sixth, and Eighth Amendments to the Constitution.

On November 20, 2019, the district court issued a preliminary injunction prohibiting the government from executing any of the four plaintiffs. *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-145, 2019 WL 6691814 (D.D.C. Nov. 20, 2019). The court held that the plaintiffs were likely to succeed on the merits of their claim "that the 2019 Protocol exceeds statutory authority." *Id.* at *7. In particular, the court concluded that "the FDPA gives decision-making authority regarding 'implementation'" of federal death sentences to states. *Id.* at *4. Thus, "insofar as the 2019 Protocol creates a single implementation procedure it is not authorized by the FDPA." *Id.* at *7. The court reasoned that the requirement to conduct executions "in the manner

8

prescribed" by state law likely applies both to the selection of an execution method, such as lethal injection, and to "additional procedural details" such as the precise procedures for "how the intravenous catheter is to be inserted." *Id.* at *4, *6. The court did not address whether the plaintiffs were likely to succeed on their various other claims. The court further held that the balance of equities and the public interest favored a preliminary injunction. *Id.* at *7.

The government filed an interlocutory appeal under 28 U.S.C. § 1292(a)(1) and moved this Court immediately to stay or vacate the injunction. Without addressing the merits, we concluded that the motion did not meet "the stringent requirements for a stay pending appeal." Order at 1, *Roane v. Barr*, No. 19-5322 (D.C. Cir. Dec. 2, 2019).

The government applied to the Supreme Court for an emergency stay or vacatur of the preliminary injunction. The Court denied the application but directed us to decide the government's appeal "with appropriate dispatch." *Barr v. Roane*, 140 S. Ct. 353 (2019 mem.). Three justices explained their view that the government was "very likely" to succeed on appeal. *Id.* (statement of Alito, J.).

We then ordered expedited briefing and argument on the government's appeal.

II

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC*, 555 U.S. 7, 22 (2008). A party "seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in

9

the public interest." *Id.* at 20. On appeal, we review the district court's legal conclusions *de novo* and its weighing of the four relevant factors for abuse of discretion. *Abdullah v. Obama*, 753 F.3d 193, 197–98 (D.C. Cir. 2014).

In reviewing a district court's conclusion as to likelihood of success, "[t]here are occasions … when it is appropriate to proceed further and address the merits" directly. *Munaf v. Geren*, 553 U.S. 674, 689–92 (2008); *see also Wrenn v. District of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017). For several reasons, we exercise our discretion to resolve the merits of plaintiffs' primary FDPA claim. This claim is a purely legal one, which the parties have briefed thoroughly. At oral argument, the parties agreed that we should decide it now. Finally, assessing only the likelihood of success would invite further litigation and delays on remand, which would hardly constitute appropriate dispatch.

The plaintiffs press two distinct claims under the FDPA. The first, on which the district court found they were likely to succeed, involves the requirement to implement federal executions in the manner provided by state law. As explained in separate opinions that follow, Judge Katsas and Judge Rao both reject that claim on the merits. Judge Katsas concludes that the FDPA regulates only the top-line choice among execution methods, such as the choice to use lethal injection instead of hanging or electrocution. Judge Rao concludes that the FDPA also requires the federal government to follow execution procedures set forth in state statutes and regulations, but not execution procedures set forth in less formal state execution protocols. Judge Rao further concludes that the federal protocol allows the federal government to depart from its procedures as necessary to conform to state statutes and regulations. On either of their views, the plaintiffs' primary FDPA claim is without merit. Accordingly, the preliminary

10

injunction must be vacated, and judgment for the government must be entered on this claim.

Alternatively, the plaintiffs contend that the federal protocol and addendum reflect an unlawful transfer of authority from the United States Marshals Service to the Federal Bureau of Prisons.  The district court did not address this claim, but the plaintiffs press it as an alternative basis for affirmance, and both parties ask us to resolve it.  A court has discretion to consider alternative grounds for affirmance resting on purely legal arguments.  *See*, *e.g.*, *United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017).  And as noted above, in addressing likelihood of success on the merits, a court has discretion to decide the claim.  Two of us address the alternative FDPA claim here.  As explained in their separate opinions, Judge Katsas would reject the claim on the merits, and Judge Rao would hold that it was forfeited.

The government also asks us to decide whether its protocol and addendum violate the notice-and-comment requirement of the Administrative Procedure Act.  The district court did not reach that issue, and the plaintiffs urge us not to reach it.  Judge Katsas and Judge Rao resolve the notice-and-comment claim because, on their view, it involves purely legal questions intertwined with the merits of the FDPA issues at the center of this appeal.  On the merits, Judge Katsas and Judge Rao conclude that the 2019 protocol and addendum are rules of agency organization, procedure, or practice exempt from the APA's requirements for notice-and-comment rulemaking. Judgment for the government must be entered on this claim.

Finally, the government asks us to reject the plaintiffs' claims under the Food, Drug, and Cosmetic Act and the Controlled Substances Act.  We decline to do so because those claims were neither addressed by the district court nor fully

11

briefed in this Court. We do share the government's concern about further delay from multiple rounds of litigation. But the government did not seek immediate resolution of all the plaintiffs' claims, including the constitutional claims and the claim that the protocol and addendum are arbitrary and capricious under the APA. Thus, regardless of our disposition, several claims would remain open on remand.

## III

The Court vacates the preliminary injunction and remands the case to the district court for further proceedings consistent with this opinion. For the reasons given in his separate opinion, Judge Tatel dissents.

*So ordered.*

KATSAS, *Circuit Judge*, concurring:  The principal question in this appeal is what constitutes a "manner" of execution within the meaning of the Federal Death Penalty Act (FDPA).  The government says that "manner" here means "method," such that the FDPA regulates only the top-line choice among execution methods such as hanging, electrocution, or lethal injection.  The plaintiffs, the district court, and Judge Tatel say that "manner" encompasses any state execution procedure, down to the level of how intravenous catheters are inserted.  Judge Rao agrees, at least if the procedure is set forth in a state statute or regulation.

In my view, the government is correct.  The FDPA's text, structure, and history show that "manner" refers only to the method of execution.  Moreover, the federal execution protocol does not violate the FDPA by transferring authority from the United States Marshals Service to the Federal Bureau of Prisons.  Furthermore, the protocol did not need to be promulgated through notice-and-comment rulemaking.  For these reasons, I would vacate the preliminary injunction and remand the case with instructions to enter judgment for the government on the plaintiffs' FDPA and notice-and-comment claims.  Finally, apart from the merits, I would vacate the preliminary injunction because the balance of equities tips decidedly in favor of the government.

I

A

The FDPA requires federal executions to be implemented "in the manner prescribed by the law of the State in which the sentence is imposed."  18 U.S.C. § 3596(a).  This appeal turns on the level of detail at which that provision operates. Does it cover the use of lethal injection rather than other execution methods such as hanging or electrocution?  The selection of a lethal substance or substances?  How much of the substance to

2

inject, and how many syringes to use for the injections?  How many intravenous lines to insert, and where to insert them?  Who should insert the lines?  In modern execution practice, governments address such issues systematically and in advance of any execution.  At the federal level, they are addressed by the FDPA, Department of Justice regulations, the federal execution protocol, and the protocol addendum.  Likewise, at the state level, they are addressed in comparable detail by state statutes, regulations, and execution protocols.

The government contends that the "manner" of execution regulated by the FDPA is simply the method or mode of execution—the top-line choice among mechanisms of fatality such as hanging, firing squad, electrocution, lethal gas, or lethal injection.  Under that interpretation, the federal protocol is clearly consistent with the FDPA:  Every state that authorizes capital punishment uses lethal injection "as the exclusive or primary means of implementing the death penalty."  *Baze v. Rees*, 553 U.S. 35, 42 (2008) (plurality opinion).  The federal regulations likewise designate lethal injection as the means for implementing capital punishment, 28 C.F.R. § 26.3(a)(4), and the federal protocol establishes procedures for these injections.

The district court and the plaintiffs read the FDPA much more broadly.  According to the district court, the FDPA covers not only the method of execution but also "additional procedural details such as the substance to be injected or the safeguards taken during the injection."  *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-145, 2019 WL 6691814, at *4 (D.D.C. Nov. 20, 2019).  These "additional procedural details" include even provisions on "how the intravenous catheter is to be inserted."  *See id.* at *6.  As an example, the district court cited state protocol provisions requiring the catheter to be inserted by "medically trained" personnel, *id.* at *6 n.6, whereas the federal protocol requires

3

the method of insertion to be determined based on "a recommendation from qualified personnel" or "the training and experience of personnel" on the execution team, App. 75. The plaintiffs largely embrace the district court's position, though they seek to carve out exceptions for *de minimis* deviations from state procedures, as well as for procedures insufficiently related to implementation of the death sentence.

1

In my view, the government is correct. All indicators of the FDPA's meaning—statutory text, history, context, and design—point to the same conclusion. The FDPA requires federal executions to follow the method of execution provided by the law of the state in which the sentence is imposed, but it does not require federal executions to follow the "additional procedural details" invoked by the district court.

The district court began its analysis quite properly, by addressing the plain meaning of the critical word "manner." The court recognized that the government's position would be correct if the FDPA had addressed the "method" rather than the "manner" of execution, because the word "method" bears "particular meaning in the death penalty context"—*i.e.*, it denotes the top-line choice among mechanisms of death such as hanging, electrocution, or lethal injection. *In re Execution Protocol Cases*, 2019 WL 6691814, at *4. But, the district court reasoned, "manner" is broader than "method" because one dictionary defines "manner" as "a mode of procedure or way of acting." *Id.* (quotation marks omitted). This analysis overlooks other definitions, as well as the need to consider statutory history and context, *see*, *e.g.*, *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 668–69 (2007); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000). Other dictionaries indicate that "manner" is

4

synonymous with "method" as well as "mode." *See*, *e.g.*, *Manner*, Black's Law Dictionary (6th ed. 1990) ("A way, mode, method of doing anything, or mode of proceeding in any case or situation."). And history strongly indicates that, in the specific context of capital punishment, all three terms refer only to the top-line choice. This is reflected in practices and usages throughout American history.

First, consider hanging. In 1790, the First Congress enacted a bill providing that "the manner of inflicting the punishment of death, shall be by hanging the person convicted by the neck until dead." Crimes Act of 1790, ch. 9, § 33, 1 Stat. 112, 119. Congress thus described "hanging" as "the" unitary "manner" of imposing capital punishment, without undertaking to specify subsidiary details such as the length of the rope, how it would be fastened around the neck, or the training of the hangman. This approach followed the law of England, where one common form of capital punishment was to be "hanged by the neck till dead." 4 W. Blackstone, *Commentaries on the Laws of England* 370 (1769). Blackstone further stated that a "sheriff cannot alter *the manner* of the execution by substituting one death for another," for "even the king cannot change the punishment of the law, by altering the hanging or burning into beheading." *Id.* at 397–98 (emphasis added). This makes clear that hanging itself was considered a "manner" of execution, as distinct from burning or beheading. But no evidence suggests that the sheriff (or the king) could not improvise "procedural details" such as the length of the rope.

In using "manner" to mean "method," the First Congress followed common historical usage. *See*, *e.g.*, 1 J. Ash, *The New and Complete Dictionary of the English Language* (2d ed. 1795) (defining "manner" as "[a] form, a method"); 2 S. Johnson, *A Dictionary of the English Language* (1755) ("Form; method."). The use of hanging as "the manner" of

5

carrying out federal executions remained unchanged from 1790 until 1937.  During that time, no federal officials undertook to regulate its "procedural details."  And during much of that time, hanging "was virtually never questioned," even though a rope too long could produce a beheading, while a rope too short could produce a prolonged death by suffocation.  *Bucklew v. Precythe*, 139 S. Ct. 1112, 1124 (2019) (quotation marks omitted).[1]

Consider also practices and usages with respect to the firing squad, another common method of execution into the 1800s. In *Wilkerson v. Utah*, 99 U.S. 130 (1878), the Supreme Court held that the use of a firing squad for executions does not violate the Eighth Amendment.  The statute at issue provided for "death by being shot, hung, or beheaded," and the court imposed a sentence requiring that the defendant be "shot until … dead."  *Id.* at 131–32 (quotation marks omitted).  The legislature did not undertake to regulate subsidiary "procedural details" such as, in the case of a firing squad, the kind or number of guns, the type of ammunition, where the shooters would aim, or how far away they would stand.  Nor did the sentencing court specify any of those details.  And although such details might have affected the likelihood of unnecessary suffering during the execution, the Court never suggested that the Eighth Amendment claim turned on any of them.  To the

---

[1] Judge Rao seeks to downplay the Crimes Act of 1790 as merely reflecting usage "on a single occasion." *Post*, at 19.  But that statute governed "the manner" of conducting federal executions for 147 years, and it is a direct predecessor of the FDPA provision at issue here.  It is obviously central to the question presented.  Judge Rao notes that section 13 of the Crimes Act of 1790 set forth different, more detailed "manners" of committing the offense of maiming. *Id.* at 14.  True enough, but the FDPA traces back to section 33 of the Act, which, in the specific context of executions, used "manner" to refer only to the top-line choice of method.

6

contrary, it surveyed various rules and customs on whether death sentences would be carried out "by shooting or hanging." *See id.* at 132–36. Moreover, it described the governing statute as addressing "the manner" of execution, *id.* at 136, and it used the words "manner," "method," and "mode" interchangeably, *see*, *e.g.*, *id.* at 134 ("shooting or hanging is the method"); *id.* at 137 (sentence "let him be hanged by the neck" addresses "the mode of execution" (quotation marks omitted)).

The history of electrocution follows much the same pattern. Introduced in 1888, it soon became "the predominant mode of execution for nearly a century," *Baze*, 553 U.S. at 42 (plurality opinion), and the Supreme Court promptly upheld it as constitutional, *In re Kemmler*, 136 U.S. 436 (1890). As *Kemmler* recounted, electrocution came to replace hanging because it was thought to be a more humane "manner" or "method" or "mode" of execution—terms the Court again used interchangeably. *See id.* at 442–47. Moreover, the underlying legal and policy debates were framed as a unitary choice between hanging and electrocution, and the reformers never undertook to prescribe subsidiary "procedural details" such as how strong an electric current would be used, where electrodes would be attached, how the electric chair would be tested, or who would train the electrocutioner. *See id.* at 444.[2]

---

[2] Judge Rao highlights the Court's statement that electrocution was painless when performed "in the manner contemplated by the [New York] statute." *Post*, at 15; *see Kemmler*, 136 U.S. at 443–44. Here is the key statutory provision, quoted in its entirety: "The punishment of death must, in every case, be inflicted by causing to pass through the body of the convict a current of electricity of sufficient intensity to cause death, and the application of such current must be continued until such convict is dead." Ch. 489, Laws of the State of New York § 505 (June 4, 1888), *quoted in Kemmler*, 136

7

In sum, here is what a reasonably informed English speaker would have known as of 1937:  For over 140 years, Congress had designated hanging as "the manner of inflicting the punishment of death" for federal capital sentences.  English law likewise had described "hanging" as a permissible "manner" of executing a death sentence.  "Manner" and "method" often were used interchangeably, including by the Supreme Court in assessing alternative execution methods such as hanging, firing squad, or electrocution.  And nobody focused on subsidiary procedural details in the legal or policy debates over these various execution methods.

The 1937 Act did not disturb this settled understanding about the "manner" of executing capital punishment.  To the contrary, although Congress changed the governing rule, it preserved the underlying semantic understanding.  Whereas the Crimes Act of 1790 had identified hanging as "the manner of inflicting the punishment of death," 1 Stat. at 119, the 1937 Act provided a different rule for "[t]he manner of inflicting the punishment of death"—*i.e.*, use "the manner prescribed by the laws of the State within which the sentence is imposed."  An Act To Provide for the Manner of Inflicting the Punishment of Death, Pub. L. No. 75-156, 50 Stat. 304 (1937).  Congress's decision to carry forward the legally operative text—regarding "the manner of inflicting the punishment of death"—also carried forward the prevailing understanding about what constituted a "manner" of execution.  The reason for this is the settled canon of construction, framed by Justice Frankfurter

---

U.S. at 444–45.  The statute thus required nothing more than electrocution.  Judge Rao briefly notes other statutory details governing the timing, location, and witnesses of the execution.  *Post*, at 16 n.9.  They would have had no conceivable bearing on the painlessness of electrocution, and they were irrelevant to the one "manner" question that the Court framed, discussed, and decided—the unitary choice between electrocution and hanging.

8

and routinely applied since, that "if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947). *See*, *e.g.*, *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019); *Stokeling v. United States*, 139 S. Ct. 544, 551 (2019); *Hall v. Hall*, 138 S. Ct. 1118, 1128 (2018).[3]

---

[3] Judge Rao seeks to downplay this canon in contending that Congress's usage in 1790 ought not matter much. She says that to maintain consistent usage of "manner" in successor statutes is to confuse the word's abstract "sense," which must remain fixed, with its concrete "reference," which can evolve. *Post*, at 19–20. She bases this view on a law-review article that seeks to link originalism to the theory of proper names espoused by the philosopher Gottlob Frege, in pursuit of a "middle ground" between the interpretive approaches of Justice Scalia and Justice Stevens. Green, *Originalism and the Sense-Reference Distinction*, 50 St. Louis U. L.J. 555, 558 (2006). Put aside the fact that leading philosophers hotly debate whether proper names even have a "sense" apart from their "reference." *See*, *e.g.*, S. Kripke, *Naming and Necessity* 22–70 (1980). Put aside the fact that no Supreme Court Justice or opinion has adopted Professor Green's account of how legal text is "partially living and partially dead." Green, *supra*, at 559. Put aside the fact that, in my view, Justice Scalia was right that legal text has "a fixed meaning, which does not change." A. Scalia*, Scalia Speaks: Reflections on Law, Faith, and Life Well Lived* 188 (E. Whelan & C. Scalia eds., 2017). Even on Professor Green's account, the reference to a top-line execution method in the Crimes Act of 1790 has significant interpretive weight in construing that statute (and its successors) over time. *See* Green, *supra*, at 560 ("While the framers are fallible regarding the reference of their [legal] language, they are still extremely useful guides."). Thus, even accepting Professor Green's theory, Judge Rao errs by failing to give substantial weight to how Congress used "manner" in the Crimes Act of 1790.

9

Likewise, the FDPA carried forward the relevant language and "old soil" from the 1937 Act.  In fact, the statutes are virtually identical in all relevant respects.  Both statutes provide for implementation of federal death sentences in the "manner" provided by state law.  *Compare* 18 U.S.C. § 3596(a) (United States marshal "shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed"), *with* 50 Stat. at 304 ("The manner of inflicting the punishment of death shall be the manner prescribed by the laws of the State within which the sentence is imposed.").  Both statutes permit, but do not require, the use of state facilities for federal executions.  *Compare* 18 U.S.C. § 3597(a) ("A United States marshal charged with supervising the implementation of a sentence of death may use appropriate State or local facilities for the purpose, may use the services of an appropriate State or local official or of a person such an official employs for the purpose, and shall pay the costs thereof in an amount approved by the Attorney General."), *with* 50 Stat. at 304 ("The United States marshal charged with execution of the sentence may use available State or local facilities and the services of an appropriate State or local official or employ some other person for such purpose, and pay the cost thereof in an amount approved by the Attorney General.").  And for convictions in states with no death penalty, both statutes require conformity to the "manner" of execution in some other state designated by the sentencing judge. *Compare* 18 U.S.C. § 3596(a) ("If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law."), *with* 50 Stat. at 304 ("If the laws of the State within which sentence is imposed make no provision for the infliction of the penalty of death, then the court shall designate some other State in which such sentence shall be

10

executed in the manner prescribed by the laws thereof."). This wholesale copying surely indicates the preservation—not abrogation—of previously settled understandings.

Nothing in 1994 usage compels a different understanding. To the contrary, at that time, many state statutes continued to describe the "manner" of execution as a top-line choice among methods such as electrocution, lethal gas, or lethal injection. *See*, *e.g.*, Cal. Penal Code § 3604(a), (d) (1994) ("manner of execution" is either by "lethal gas" or "intravenous injection of a substance or substances in a lethal quantity sufficient to cause death"); La. Rev. Stat. Ann. § 15:569 (1994) ("manner of execution" is either "electrocution," defined as "causing to pass through the body of the person convicted a current of electricity of sufficient intensity to cause death," or "lethal injection," defined as "the intravenous injection of a substance or substances in a lethal quantity into the body of a person convicted"); Mo. Rev. Stat. § 546.720 (1994) ("The manner of inflicting the punishment of death shall be by the administration of lethal gas or by means of the administration of lethal injection."); Vt. Stat. Ann. tit. 13, § 7106 (1994) ("Manner of execution" is "causing to pass through the body of the convict a current of electricity of sufficient intensity to cause death"). A handful of state statutes went one small step further, by using "manner" to refer to types of lethal substances. But none of them required the use of any particular substance, much less even more granular details. *See* Colo. Rev. Stat. § 16-11-401 (1994) ("The manner of inflicting the punishment of death shall be by the administration of a lethal injection," defined as "continuous intravenous injection of a lethal quantity of sodium thiopental or other equally or more effective substance sufficient to cause death."); Md. Code Ann., Crimes and Punishments § 71(a) (1994) ("The manner of inflicting the punishment of death shall be the continuous intravenous administration of a lethal quantity of an ultrashort-

11

acting barbiturate or other similar drug in combination with a chemical paralytic agent.");[4] Miss. Code Ann. § 99-19-51 (1994) (similar to Maryland, but with alternative provision that "the manner of inflicting the punishment of death shall be by lethal gas"); Okla. Stat. tit. 22, § 1014 (1994) ("Manner of inflicting punishment of death" is either "continuous, intravenous administration of a lethal quantity of an ultrashort-acting barbiturate in combination with a chemical paralytic agent," or "electrocution" or "firing squad").[5]

As of 1994, Supreme Court decisions reflected similar understandings. Between 1937 and 1994, the Court became much more active in policing capital punishment. But the Court never retreated from its holdings that the firing squad and electrocution are constitutional methods of execution. Likewise, the Court had not yet approved granular, post-habeas challenges to the specific details of an execution. To the contrary, in *Gomez v. United States District Court*, 503 U.S. 653 (1992) (per curiam), the Court summarily rejected a claim that "execution by lethal gas" violated the Eighth Amendment, and it did so because the claim had not been properly channeled through the federal habeas statute. *Id.* at 653–54. The Court's first, tentative approval of claims challenging procedural details such as the method of "venous access" did not come until a decade after the FDPA was enacted, *Nelson v.*

---

[4] Three other states used a similar formulation. *See* N.H. Rev. Stat. Ann. § 630:5, XIII (1994); N.M. Stat. § 31-14-11 (1994); S.D. Codified Laws § 23A-27A-32 (1994).

[5] Despite this occasional, slightly broader usage of "manner" in state statutes, the traditional usage remained common, and no state statute even remotely addressed items such as the details of catheter insertion. In any event, the obvious model for the FDPA was the 1937 federal statute, so it is by far the most important data point.

12

*Campbell*, 541 U.S. 637 (2004), and its wholesale approval of post-habeas challenges to the details of lethal-injection protocols did not come until even later, *Hill v. McDonough*, 547 U.S. 573 (2006).[6]

In sum, practices and usages in 1994 mirrored those in 1937: Inquiries into the manner or method of execution focused on the choice between say, lethal gas or lethal injection—not the choice of specific lethal agents or procedures for releasing the gas or inserting the catheter. In common understanding, what mattered was the top-line choice.

Within the FDPA itself, statutory context reinforces this understanding. The FDPA states that the marshal responsible for supervising a federal execution "may use appropriate State or local facilities" and "may use the services of an appropriate State or local official." 18 U.S.C. § 3597(a). These grants of authority would be unnecessary if section 3596(a), the "manner" provision directly at issue, independently required the use of all state execution procedures. After all, states conduct executions in designated state facilities. *See*, *e.g.*, Ind. Code § 35-38-6-5 (2019) ("inside the walls of the state prison"); Mo. Rev. Stat. § 546.720 (2019) ("within the walls of a correctional facility of the department of corrections"); Tex. Dep't of Crim. Justice, *Execution Procedure* § III.B (2019) (Huntsville Unit). Thus, if section 3596 required use of state facilities, section 3597 accomplished nothing by permitting their use. Of course, interpretations that create surplusage are disfavored. *See*, *e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 31

---

[6] Judge Rao cites a handful of judicial opinions loosely using the word "manner" to refer to subsidiary execution details. *Post*, at 4–5 & n.2. Three of them post-date *Nelson* and *Hill*—the first Supreme Court decisions to suggest that such details might have any legal relevance. Two others are either lower-court decisions or dissents. None involves a statutory usage of "manner."

13

(2001).  The plaintiffs respond that section 3597 creates a "limited exception to Section 3596, permitting (but not requiring) the Government to use its own facilities." Appellees' Br. 30 n.6.  But that makes section 3597 even stranger, for providing that the federal government "may" use "State" facilities would be a remarkably clumsy way of permitting the federal government to use *federal* facilities.

Finally, consider statutory design.  In "ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988).  Here, the plaintiffs' interpretation of "manner" would frustrate a principal objective of the Federal *Death Penalty* Act—to provide for an administrable scheme of capital punishment.  As Justice Alito explained, the plaintiffs' interpretation "would require the BOP to follow procedures that have been attacked as less safe than the ones the BOP has devised (after extensive study); it would demand that the BOP pointlessly copy minor details of a State's protocol; and it could well make it impossible to carry out executions of prisoners sentenced in some States." *Barr v. Roane*, 140 S. Ct. 353, 353 (2019) (statement of Alito, J.).  The plaintiffs dismiss these points as mere policy arguments, but they are more than that.

The FDPA was enacted as Title VI of the Violent Crime Control and Law Enforcement Act of 1994.  *See* Pub. L. No. 103-322, § 60001, 108 Stat. 1796, 1959.  These statutes sought to ensure a workable and expanded system of capital punishment.  The larger statute created more than two dozen new capital offenses.  *See* DOJ, *Criminal Resource Manual* § 69 (2020).  And the FDPA established procedures to ensure the fair administration of capital punishment—by specifying aggravating circumstances that a jury must find in order to

14

render the defendant eligible for the death penalty, 18 U.S.C. § 3592(b)–(d); by allowing a jury to consider any mitigating circumstances, *id.* § 3592(a); and by requiring separate guilt and sentencing determinations, *id.* § 3593. These provisions cured potential Eighth Amendment problems, *see*, *e.g.*, *Maynard v. Cartwright*, 486 U.S. 356, 361–63 (1988) (aggravating factors); *Eddings v. Oklahoma*, 455 U.S. 104, 110–12 (1982) (mitigating factors); *Gregg v. Georgia*, 428 U.S. 153, 190–92 (1976) (plurality opinion) (separate sentencing hearing), to ensure that the scheme would be usable. Finally, the FDPA contains one provision specifically designed to prevent the choices of an individual state from effectively nullifying the federal death penalty. It provides: "If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death …." 18 U.S.C. § 3596(a).

The plaintiffs do not dispute that this scheme would be upset if individual states could effectively obstruct the federal death penalty. Yet their interpretation would make such obstruction likely. For example, states could block federal death sentences by refusing to disclose their full execution protocols. Some might do so because of moratoria on the use of capital punishment, like those ordered by the governors of California and Pennsylvania.[7] Other states simply may wish not to assist in the enforcement of federal law. *See*, *e.g.*, *Printz v. United States*, 521 U.S. 898, 923 (1997). And state statutes may prohibit disclosure of state execution protocols. *See*, *e.g.*, Ark. Code Ann. § 5-4-617(i)(1) (2019). The plaintiffs' only

---

[7] *See* Calif. Exec. Order No. N-09-19 (Mar. 13, 2019); *Governor Tom Wolf Announces a Moratorium on the Death Penalty in Pennsylvania*, Office of the Pa. Gov. (Feb. 13, 2015), https://www. governor.pa.gov/newsroom/moratorium-on-the-death-penalty-in-pennsylvania.

15

response is that the federal government obtained several state protocols in developing its own 2019 protocol. Yet while about thirty states authorize capital punishment, the federal government was able to obtain only five actual state protocols, plus a "summary" of the others provided by a private advocacy group. App. 10.

Adherence to the minutiae of state execution protocols is not only pointless, but practically impossible. State protocols are as detailed as the federal one—from Arkansas's color-coding to ensure that three lethal agents are properly separated among nine syringes, *Arkansas Lethal Injection Procedure*, Attachment C, § III.5.a (Aug. 6, 2015), to Indiana's seventeen-step "procedure for venous cut down," Ind. Dep't of Corr., *Facility Directive ISP 06-26: Execution of Death Sentence*, Appendix A (Jan. 22, 2014). Conducting a single execution under the federal protocol requires extensive preparation by a trained execution team of over 40 individuals, as well as further support from 250 more individuals at the federal execution facility in Terre Haute, Indiana. App. 93–94. Simultaneously managing the same logistical challenges under a few dozen state protocols—all different—would be all but impossible.

The plaintiffs offer two limiting principles to mitigate this problem, but neither would work. First, they suggest a *de minimis* exception to the otherwise unyielding requirement to follow state procedures. But that would invite endless litigation over which requirements are *de minimis*. Must the federal government follow state provisions regarding the number of backup syringes? *Compare* App. 75 (two sets under federal protocol), *with* Mo. Dep't of Corr., *Preparation and Administration of Chemicals for Lethal Injection* §§ B, E (one set under Missouri protocol). The type of catheters used? The selection of execution personnel? The training of those personnel? The same problem inheres in the plaintiffs' related

16

suggestion that some protocol details might not relate sufficiently to "implementation" of the sentence. Would that exception cover rules for how long the inmate must remain strapped to the gurney? App. 40 (under federal protocol, between 30 minutes and three hours). Rules about whom the inmate may have present? Rules about the inmate's final meal or final statement? Rules about opening and closing the execution chamber's drapes? All such questions would be raised at the last minute—likely producing stays, temporary restraining orders, preliminary injunctions, and interlocutory appeals like this one, which will delay lawful executions for months if not years. In sum, the plaintiffs' interpretation would make the federal death penalty virtually un-administrable.[8]

2

The plaintiffs' further counterarguments are unavailing. First, the plaintiffs highlight the statutory text immediately surrounding "manner"—the language stating that a United States marshal "shall supervise implementation" of a death sentence in the manner prescribed by state law. 18 U.S.C. § 3596(a). The plaintiffs contend that "implementation" of a death sentence refers to the entire process for carrying it out, not just the use of a top-line execution method. But the only

---

[8] Judge Rao correctly notes that bargains reflected in statutory text must be enforced as against generalized appeals to statutory purpose. *Post*, at 22–24. But statutory purpose, as reflected in "the language and design of the statute as a whole," can help determine textual meaning or resolve textual ambiguity. *See*, *e.g.*, *K Mart*, 486 U.S. at 291. Judge Rao does not dispute that one significant purpose of the FDPA is to ensure an administrable system of capital punishment, and her own analysis thus properly considers whether the plaintiffs' proposed construction would raise "practical, and perhaps insurmountable, difficulties to the implementation of federal death sentences." *Post*, at 12–13.

17

implementing detail that must follow state law is the "manner" of carrying out the execution—which begs the question of what that term does and does not encompass.

The plaintiffs next invoke a different FDPA provision defining aggravating circumstances to include cases where "[t]he defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim."  18 U.S.C. § 3592(c)(6).  They reason that this FDPA provision uses "manner" broadly, so other FDPA provisions must do likewise. But the presumption of consistent usage "readily yields to context, especially when" the term at issue "takes on distinct characters in distinct statutory provisions."  *Return Mail, Inc. v. USPS*, 139 S. Ct. 1853, 1863 (2019) (quotation marks omitted).  That qualification perfectly fits this case, for each FDPA provision has its own history.  As explained above, the provision regarding the "manner" of executing a death sentence traces back to the Crimes Act of 1790.  In contrast, section 3592(c)(6) was copied nearly verbatim from the Anti-Drug Abuse Act of 1988, *see* Pub. L. No. 100-690, § 7001, 102 Stat. 4181, 4392, which in turn responded to a Supreme Court decision allowing consideration of a "heinous, atrocious, or cruel" aggravating factor only as narrowed to require "torture or serious physical abuse," *Cartwright*, 486 U.S. at 363–65 (quotation marks omitted).  Because section 3592(c)(6) carries its own "old soil," the presumption of consistent usage must yield to context.

Finally, the plaintiffs stress that between 1995 and 2008, Congress failed to enact some nine bills that would have allowed federal capital punishment to be implemented in a manner independent of state law.  But "failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute."  *Cent. Bank of Denver, N.A.*

18

*v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994) (quotation marks omitted). The plaintiffs highlight DOJ statements that the FDPA imperiled its 1993 regulation, which establishes lethal injection as the sole method for federal executions. But those statements were made when some states still provided for electrocution "as the sole method of execution." *See Baze*, 553 U.S. at 42–43 n.1 (plurality opinion). In 2009, Nebraska became the last death-penalty state to authorize lethal injection as a permissible execution method. *See* Act of May 28, 2009, L.B. 36, 2009 Neb. Laws 52. After that, attempts to amend the FDPA ceased, as did DOJ's support for them. So, DOJ's current interpretation of the FDPA to encompass methods of execution, but not subsidiary procedural details, has been consistent.

3

Judge Rao takes a different approach advocated by none of the parties. In her view, the word "manner" is flexible enough, considered in isolation, to refer either to the top-line method of execution or to the full panoply of execution procedures. *Post*, at 1–6. So far, so good. She then reasons that, by requiring federal executions to be conducted "in the manner prescribed by the law of the State in which the sentence is imposed," Congress specified "the level of generality" for interpreting the word "manner." *Id.* at 1. She thus concludes that Congress used "manner" in its broad sense, so as to include all execution procedures—no matter how picayune—that are "prescribed by the law of the State." *Id.* at 22. For Judge Rao, as it turns out, the key to this case is not the word "manner," but the phrase "prescribed by the law of the State."

This account runs contrary to established rules of grammar and statutory interpretation. As a matter of grammar, the participial phrase "prescribed by the law of the State" functions

19

as an adjective and modifies the noun "manner." By using the adjective to construe the noun broadly, Judge Rao overlooks "the ordinary understanding of how adjectives work." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 368 (2018). "Adjectives modify nouns—they pick out a subset of a category that possesses a certain quality." *Id.* They ordinarily do not expand the meaning of the noun they modify. Thus, "critical habitat" must first be "habitat." *See id.* Likewise, "full costs" must first be "costs." *See Rimini Street, Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 878–79 (2019). And here, whatever is "prescribed by the law of the State" must first be a "manner" of execution. In short, the limiting adjective provides no basis for interpreting the noun broadly.

To be sure, adjectival phrases can clarify the meaning of ambiguous nouns by ruling out certain possibilities through context. For example, in the abstract, the noun "check" might refer to "an inspection, an impeding of someone else's progress, a restaurant bill, a commercial instrument, a patterned square on a fabric, or a distinctive mark-off." A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 70 (2012). But when "check" is combined with the adjectival phrase "made payable to the IRS," we know that the noun refers only to a commercial instrument. In this example, the phrase "made payable to the IRS" clarifies the meaning of "check" because it is consistent with only one possible understanding of it.

The FDPA does not work like that. Divorced from its statutory history, the noun "manner" could mean either the top-line execution method or all state execution procedures. But the adjectival phrase "prescribed by the law of the State" cannot resolve this ambiguity, because it is perfectly consistent with *both* meanings. On the one hand, states use their laws to prescribe the top-line method of execution. On the other hand,

20

they also use their laws to specify additional procedural details. So the adjectival phrase "prescribed by the law of the State" tells us nothing about the meaning of the noun "manner"—and certainly does not undermine a historical understanding of that term dating back to our country's founding.[9]

Judge Rao stresses the assertedly limited scope of her reading of the FDPA. She interprets the phrase "prescribed by the law of the State" to mean execution procedures set forth only in state "statutes and regulations carrying the force of law," but not in less formal state execution protocols. *Post*, at 6. And that interpretation, she concludes, "mitigates many of the concerns raised by the district court's broad reading" of the FDPA. *Id.* at 26. All of this is a good reason for rejecting an interpretation of the FDPA that encompasses procedural details set forth only in state execution protocols. But it is not a good reason for rejecting the historical understanding of "manner," which creates no practical concerns about administrability.

Judge Rao also understates the practical difficulties with her proposed interpretation. For one thing, state statutes and regulations do contain many granular details. Consider just the four state death-penalty statutes before us in this case. The Arkansas statute requires that catheters be "sterilized and prepared in a manner that is safe." Ark. Code Ann. § 5-4-617(f) (2019). The Indiana statute excludes lawyers from the persons who "may be present at the execution." Ind. Code

---

[9]  To make the adjectival reference to state law narrow the noun "manner," Judge Rao must retreat to the position that "manner," construed *without* reference to the adjectival phrase, "is broad enough to encompass execution procedures at every level of generality." *Post*, at 9 n.5. As explained above, that position cannot be reconciled with historical usages and understandings tracing back to the First Congress.

21

§ 35-38-6-6(a) (2019).  The Missouri statute requires the execution chamber to be "suitable and efficient."  Mo. Rev. Stat. § 546.720.1 (2019).  And the Texas statute prohibits the infliction of any "unnecessary pain" on the condemned prisoner.  Tex. Code Crim. Proc. Ann. art. 43.24 (2019).  Assimilating the various state statutes and regulations will present significant logistical challenges.  And, of course, these various provisions will provide ample opportunity for last-minute stay litigation.

Moreover, the line between "formal" regulations "carrying the force of law" and "informal policy or protocol," *post*, at 6–8, will be another fertile source of litigation.  At the state level, how "formal" is formal enough?  Even at the federal level, the question of which regulations have the force of law has been "the source of much scholarly and judicial debate."  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).  Yet now, courts will be forced to confront every variation of that question arising out of the administrative law of some thirty states.  What if a state administrative procedure act permits rulemaking through processes less formal than notice-and-comment?  What if a warden may change protocol procedures unilaterally, but only under limited circumstances?  What if a state court moves the goalposts with an unexpected interpretation of the governing rules?  Litigation over such matters will foreclose any realistic possibility for the prompt execution of federal death sentences.[10]

---

[10]  To be clear, I agree with Judge Rao that the FDPA's reference to "law of the State" covers only state statutes and binding regulations.  *Post*, at 6–8.  I also agree with Judge Rao that because the state protocols in this case "do not appear to have the binding force of law, they cannot be deemed part of the 'law of the State.'"  *Id.* at 28 n.15.  Accordingly, those propositions constitute holdings of this Court.

22

\* \* \* \*

For all these reasons, I would hold that the FDPA requires the federal government to follow state law regarding only the method of execution and does not regulate the various subsidiary details cited by the plaintiffs and the district court. On that interpretation, the plaintiffs' primary FDPA claim is without merit.

B

In the alternative, the plaintiffs contend that the 2019 protocol violates the FDPA by impermissibly shifting authority from the United States Marshals Service to the Federal Bureau of Prisons.  The plaintiffs rest this argument on FDPA provisions requiring a United States marshal to "supervise implementation" of the death sentence.  18 U.S.C. § 3596(a); *see also id.* § 3597(a).  The district court did not reach this argument, but the parties have briefed it and the plaintiffs urge it as an alternative ground for affirmance.

The execution protocol does not strip the Marshals Service of the power to supervise executions.  To the contrary, it requires a "United States Marshal designated by the Director of the USMS" to oversee the execution and to direct which other personnel may be present at it.  App. 30.  The "execution process," which starts at least thirty minutes before the actual execution, cannot begin without the marshal's approval.  App. 40.  The same is true for the execution itself.  App. 44, 68. Individuals administering the lethal agents are "acting at the

---

*See Marks v. United States*, 430 U.S. 188, 193–94 (1977).  But I do not share Judge Rao's optimism that a "law of the State" limitation, imposed on an otherwise unbounded interpretation of "manner," will avoid "practical, and perhaps insurmountable, difficulties to the implementation of federal death sentences."  *Post*, at 12–13.

23

direction of the United States Marshal." App. 74. And once the execution is complete, the marshal must notify the court that its sentence has been carried out. App. 44–45. The protocol thus tasks the USMS with supervising executions.

In any event, federal law vests all powers of DOJ components in the Attorney General and permits him to reassign powers among the components. "All functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General." 28 U.S.C. § 509. The Marshals Service is "a bureau within the Department of Justice under the authority and direction of the Attorney General." *Id.* § 561(a). Its powers are thus ultimately vested in the Attorney General. Moreover, the Attorney General may delegate his powers to "any other officer, employee, or agency of the Department of Justice." *Id.* § 510. Together, these provisions permit the Attorney General to reassign duties from the Marshals Service to the Bureau of Prisons.

The plaintiffs invoke *United States v. Giordano*, 416 U.S. 505 (1974). There, the Supreme Court held that a statute "expressly" limiting the Attorney General's power to delegate wiretap authority to a handful of enumerated officials qualified his general authority to reassign DOJ functions. *Id.* at 514. But the FDPA contains no such language expressly prohibiting the Attorney General from deciding or delegating matters relating to executions. For these reasons, the protocol allocates duties consistent with the FDPA, so the plaintiffs' alternative FDPA argument is also without merit.[11]

---

[11] Judge Rao contends that the plaintiffs forfeited this argument by not raising it below. *Post*, at 32. But plaintiff Lee, in support of his motion for a preliminary injunction, identified eight provisions in the

24

C

The federal protocol is both a procedural rule and a general policy statement exempted from the notice-and-comment requirements of the Administrative Procedure Act.  *See* 5 U.S.C. § 553(b)(3)(A).

"The critical feature of a procedural rule is that it covers agency actions that do not themselves alter the rights or interests of parties." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (quotation marks omitted).  The federal protocol does not alter the plaintiffs' rights or interests, which were all but extinguished when juries convicted and sentenced them to death.  Moreover, pre-existing law establishes lethal injection as the method of execution, 28 C.F.R. § 26.3(a)(4), and the protocol simply sets forth procedures for carrying out the injections.

The execution protocol is also a general statement of agency policy.  In defining this category, "[o]ne line of analysis

---

execution protocol that he says impermissibly granted authority to the Bureau of Prisons. *See* Lee Mot. for Prelim. Inj., *In re Execution Protocol Cases*, No. 1:19-mc-145 (D.D.C.), ECF Doc. 13-1, at 10–12.  Lee argued that each of the provisions is "[c]ontrary to Section 3596 of [the] FDPA, which only refers to the U.S. Marshal supervising implementation." *Id.*  Moreover, the government did not argue for a forfeiture, and thus "forfeited [the] forfeiture argument here." *Solomon v. Vilsack*, 763 F.3d 1, 13 (D.C. Cir. 2014).  And for several reasons, it would make good sense for us to excuse any forfeiture:  The plaintiffs' alternative FDPA claim turns on purely legal questions, it was fully briefed on appeal, both parties ask us to decide it, the Supreme Court has asked us to proceed with appropriate dispatch, and this claim, even if not pursued in the preliminary-injunction motions, would remain live on remand.

25

considers the effects of an agency's action, inquiring whether the agency has (1) impose[d] any rights and obligations, or (2) genuinely [left] the agency and its decisionmakers free to exercise discretion." *Clarian Health West, LLC v. Hargan*, 878 F.3d 346, 357 (D.C. Cir. 2017) (quotation marks omitted). A second line "looks to the agency's expressed intentions, including consideration of three factors: (1) the [a]gency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency." *Id.* (quotation marks omitted). Here, the protocol contains no rights-creating language. Just the opposite, it states that "[t]his manual explains internal government procedures and does not create any legally enforceable rights or obligations." App. 24. Likewise, the protocol explicitly permits "deviation[s]" and "adjustment[s]" upon a determination "by the Director of the BOP or the Warden" that the deviation is "required," thus preserving a healthy measure of agency discretion. *Id.* Finally, the protocol was published in neither the Code of Federal Regulations nor the Federal Register.

For these reasons, the federal protocol was not subject to notice-and-comment requirements, and the plaintiffs' contrary claim is without merit.[12]

---

[12] Given the flexibility built into the federal protocol, I agree with Judge Rao that it may be adjusted to conform to state law to whatever extent the FDPA may require. *Post*, at 29–30. That saves the protocol itself from attack under Judge Rao's construction of the FDPA. But, as explained above, it opens the door to a wide range of challenges to federal executions under the minutiae of state execution statutes and regulations.

26

II

Wholly apart from the merits, I would reverse the preliminary injunction because the balance of harms and the public interest strongly favor the government. The party seeking a preliminary injunction "must establish" not only a likelihood of success on the merits, but also "that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *see also Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987). And appellate courts may reverse preliminary injunctions where, apart from the merits, the district court's equitable balancing constituted an abuse of discretion. *See NRDC*, 555 U.S. at 24–26, 32.

In this case, the district court failed to recognize the important governmental and public interest in the timely implementation of capital punishment. The court concluded that any "potential harm to the government caused by a delayed execution is not substantial." *In re Execution Protocol Cases*, 2019 WL 6691814, at *7. In contrast, the Supreme Court frequently has explained that "both the [government] and the victims of crime have an important interest in the timely enforcement of a [death] sentence," which is frustrated by decades of litigation-driven delay. *Bucklew*, 139 S. Ct. at 1133 (quotation marks omitted). Indeed, "when lengthy federal proceedings have run their course"—as is the case here— "finality acquires an added moral dimension." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998). "Only with an assurance of real finality can the State execute its moral judgment in a case." *Id.* And "[o]nly with real finality can the victims of crime move forward knowing the moral judgment will be carried out." *Id.* "To unsettle these expectations is to inflict a profound injury to the 'powerful and legitimate interest in

27

punishing the guilty.'" *Id.* (quoting *Herrera v. Collins*, 506 U.S. 390, 421 (1993) (O'Connor, J., concurring)).

These interests are magnified by the heinous nature of the offenses committed by the appellees—all of whom murdered children—as well as the decades of delay to date.

In 1999, an Arkansas jury convicted Daniel Lee of three counts of murder in aid of racketeering. The murders were committed in 1996, during a robbery to fund a white supremacist organization. *United States v. Lee*, 374 F.3d 637, 641 (8th Cir. 2004). After overpowering a couple and their eight-year-old daughter in their home, Lee and a confederate "shot the three victims with a stun gun, placed plastic bags over their heads, and sealed the bags with duct tape." *Id.* at 641–42. They then drove the family to a bayou, taped rocks to their bodies, and threw them into the water to suffocate or drown. *Id.* at 642. The Eighth Circuit affirmed Lee's death sentence on direct review, *id.*, and thrice denied him collateral relief, *Lee v. United States*, No. 19-3576 (8th Cir. Jan. 7, 2020); *United States v. Lee*, 792 F.3d 1021 (8th Cir. 2015); *United States v. Lee*, 715 F.3d 215 (8th Cir. 2013). Nonetheless, Lee continues to pursue a fourth round of collateral review. *Lee v. United States*, No. 2:19-cv-00468 (S.D. Ind. Dec. 5, 2019), *preliminary injunction vacated by Lee v. Watson*, No. 19-3399 (7th Cir. Dec. 6, 2019).

In 2003, a Missouri jury convicted Wesley Purkey of the kidnapping, rape, and murder of sixteen-year-old Jennifer Long in 1998. *United States v. Purkey*, 428 F.3d 738, 744–45 (8th Cir. 2005). After killing the girl, Purkey dismembered her body with a chainsaw and burned her remains. *Id.* at 745. The jury found nine aggravating factors, including that Purkey had previously bludgeoned a woman to death with a hammer. *Id.* at 746. The Eighth Circuit affirmed Purkey's death sentence

28

on direct review, *id.* at 744, and later denied him collateral relief, *Purkey v. United States*, 729 F.3d 860 (8th Cir. 2013).

In 2004, an Iowa jury convicted Dustin Honken of murdering five individuals in 1999, including two witnesses to his drug trafficking and two young children. *United States v. Honken*, 541 F.3d 1146, 1148 (8th Cir. 2008). Honken and an accomplice kidnapped one witness, the witness's girlfriend, and her six- and ten-year-old daughters. Honken murdered all four execution-style, by shooting each in the head. *Id.* at 1149–51. Four months later, Honken murdered another prospective witness against him. *Id.* at 1148, 1151. Then, while in prison awaiting trial, he made plans to murder additional witnesses. *Id.* at 1150–51. Because Iowa has no death penalty, the district court ordered Honken to be executed in the manner provided by Indiana law. The Eighth Circuit affirmed the death sentence on direct appeal, *id.* at 1148, and then declined to set it aside on collateral review, *see Honken v. United States*, 42 F. Supp. 3d 937, 1196–97 (N.D. Iowa 2013), *certificate of appealability denied*, No. 14-1329 (8th Cir. May 2, 2014).

In 2004, a Texas jury convicted Alfred Bourgeois of murdering his two-year-old daughter in 2002. *United States v. Bourgeois*, 423 F.3d 501, 503 (5th Cir. 2005). Before the murder, Bourgeois "systematically abused and tortured" the child—he punched her in the face, whipped her with an electrical cord, hit her head with a plastic bat so many times that it "was swollen like a football," and later bragged to a fellow inmate that the "f—ing baby's head got as big as a watermelon." *Id.* He bit her, scratched her, and burned the bottom of her feet with a cigarette lighter. When others tried to clean the sores, Bourgeois "would stop them and jam his dirty thumb into the wounds, then force [her] to walk" on them. *Id.* After her training potty tipped over, Bourgeois repeatedly slammed the back of her head into a window. He refused to

29

take the girl's limp body to the hospital, but a passer-by called an ambulance. "The doctors sustained [her] on life support until her mother could get to the hospital, where the baby died in her mother's arms the next day." *Id.* at 505. In affirming the death sentence, the Fifth Circuit described this as "not a close case." *Id.* at 512. That court later denied post-conviction relief. *United States v. Bourgeois*, 537 F. App'x 604, 605 (5th Cir. 2013) (per curiam).

These crimes were committed twenty-four, twenty-two, twenty-one, and eighteen years ago respectively. Each appellee received the full panoply of procedural protections afforded under the Constitution and the FDPA. Each received direct review and one or more rounds of collateral review. Yet now, supported by fifteen lawyers on just this appeal, they continue to litigate with a vengeance, ostensibly over the manner of their executions, but with the obvious and intended effect of delaying them indefinitely. As the Supreme Court noted in *Bucklew*, with apparent exasperation, the people and the surviving victims "deserve better." 139 S. Ct. at 1134.

The district court stressed that the government took eight years to craft its revised execution protocol. True enough, but things were fine in 2008, with a three-drug execution protocol in place and approved by the Supreme Court in *Baze*. Then began a long and successful campaign of obstruction by opponents of capital punishment, which removed sodium thiopental from the market by 2011 and made pentobarbital unavailable shortly thereafter. *See Glossip v. Gross*, 135 S. Ct. 2726, 2733 (2015). At that point, the government's options were severely limited, and it can hardly be faulted for proceeding with caution. The government declined to press ahead with an available three-drug protocol using midazolam—a milder sedative than either sodium thiopental or pentobarbital—and two other substances to stop respiration

30

and induce cardiac arrest.  Its hesitation in the face of uncertainty proved reasonable, as four Justices would later describe this protocol as possibly "the chemical equivalent of being burned at the stake."  *Id.* at 2781 (Sotomayor, J., dissenting).

Instead of proceeding with an inferior option, the government waited until pentobarbital again became available. That barbiturate—which can act as both sedative and lethal agent—is "widely conceded to be able to render a person fully insensate," *Zagorski v. Parker*, 139 S. Ct. 11, 11–12 (2018) (Sotomayor, J., dissenting from denial of application for stay and denial of certiorari), thus ensuring a painless execution. The government also took time to study the successful track record of pentobarbital, documenting its use without incident in more than 100 state executions, A.R. 929–30, as well as the many cases that have upheld its use, *see*, *e.g.*, *Zink v. Lombardi*, 783 F.3d 1089, 1102 (8th Cir. 2015) (en banc) (per curiam); *Ladd v. Livingston*, 777 F.3d 286, 289–90 (5th Cir. 2015).  The government's care in selecting an available and effective execution substance does not diminish the importance of carrying out the appellees' sentences.

On the other side of the balance, a death sentence is of course serious business.  But here, there is no dispute that the appellees may be executed by lethal injection, nor any colorable dispute that pentobarbital will cause anything but a swift and painless death.  Instead, the plaintiffs contend only that their executions cannot occur until the federal government replicates every jot-and-tittle of the relevant state execution protocols.  And in doing so, they would expose other death-row inmates to substances less reliably certain to ensure a painless death than is pentobarbital—including midazolam, which remains in use in five different states. A.R. 92–93.  The claims before us are designed neither to prevent unnecessary suffering

31

nor to ensure that needles are properly inserted into veins—a task that nurses routinely perform without difficulty.  Instead, they are designed to delay lawful executions indefinitely.  We should not assist in that undertaking.

\*   \*   \*   \*

For these reasons, I would vacate the preliminary injunction and remand the case to the district court with instructions to enter judgment for the government on the plaintiffs' FDPA claims and their notice-and-comment claims.

Rao, *Circuit Judge*, concurring: The Department of Justice specified a range of procedures to govern federal executions in its 2019 protocol and addendum. Plaintiffs allege that the Department's protocol is inconsistent with the Federal Death Penalty Act ("FDPA"), which requires that federal executions be implemented "in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). At every stage of this litigation, the debate has centered on whether "manner" should be read at a particular level of generality. The word "manner," however, cannot be interpreted in isolation. It is a broad, flexible term whose specificity depends on context. The FDPA explicitly defines the level of generality of "manner": It is the "manner prescribed by the law of the State." Thus, the FDPA requires the federal government to apply state law—that is, statutes and formal regulations—at whatever level of generality state law might be framed. Where state law is silent, the federal government has discretion to choose whatever lawful execution procedures it prefers.

Under this interpretation, the Department of Justice's 2019 protocol is consistent with the FDPA. The protocol lays out a non-binding procedural framework that the federal government may apply in most cases, and it allows the U.S. Marshal Service to depart from federal procedures when required—a carveout that naturally would encompass situations in which the 2019 protocol conflicts with state law. I therefore agree to vacate the preliminary injunction.

I.

Assessing the validity of the 2019 protocol requires us first to interpret the reach of the FDPA. The Department of Justice maintains that "manner" as used in the FDPA means only the method of execution—i.e., hanging, electrocution, or lethal injection—leaving the government free to set forth a uniform procedure for executions. The plaintiffs, on the other hand,

2

assert that "manner" means any procedures used by a state when implementing the death penalty, thereby precluding any kind of uniform federal protocol. Neither reading comports with the FDPA when read as a whole. In the FDPA, Congress left certain choices regarding execution to the States. Considering the text and structure of the statute, I explain why the FDPA requires the federal government to apply only those execution procedures prescribed by a state's statutes and formal regulations, but leaves the federal government free to specify other procedures or protocols not inconsistent with state law. Moreover, nothing in the statutory history offers a basis to override the plain meaning of the FDPA.

A.

The FDPA provides that the U.S. Marshal "shall supervise implementation of the sentence [of death] in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). The parties as well as my colleagues focus on the meaning of the word "manner." As I explain, the word "manner" may refer to varying levels of specificity, both in its ordinary meaning and in the context of execution procedures. Reading "manner" alongside other words in Section 3596(a), as well as the statute as a whole, demonstrates that the FDPA uses "manner" to include the positive law and binding regulations of a state—those procedures "prescribed by the law of the State." State "law," however, does not include informal procedures or protocols. In the absence of binding state law, the FDPA leaves other procedures to the discretion of the U.S. Marshal who must "supervise implementation of the sentence" of death.

1.

In ordinary usage, the word "manner" has a broad, flexible meaning. A "manner" is "a characteristic or customary mode

3

of acting" or "a mode of procedure." *Manner*, Merriam-Webster's Collegiate Dictionary (11th ed. 2014). Put differently, a "manner" is "[a] way of doing something or the way in which a thing is done or happens." *Manner*, The American Heritage Dictionary of the English Language (5th ed. 2018). "Manner" may therefore refer to a general way of doing something or the more specific way in which an action is carried out. The word had a similarly broad meaning when the first two federal death penalty statutes were passed in 1790 and 1937. *See Manner*, New International Dictionary of the English Language (2d ed. 1941) ("[A] way of acting; a mode of procedure; the mode or method in which something is done or in which anything happens."); 2 S. Johnson, *A Dictionary of the English Language* (1755) ("Custom; habit; fashion.").[1]

The word "manner" has the same flexible meaning in the execution context, as demonstrated by federal and state statutes and judicial decisions that use the word with varying levels of generality. As DOJ notes, the word is sometimes used to refer to a general execution method, and courts occasionally use the terms "manner" and "method" interchangeably; yet "manner"

---

[1] Judge Katsas makes much of the fact that eighteenth-century dictionaries, including Samuel Johnson's, also defined "manner" as a "method," Concurring Op. 4–5 (Katsas, J.), but he overlooks that those dictionaries defined "method" in broad terms. For instance, Johnson's dictionary states: "*Method*, taken in the largest sense, implies the placing of several things, or performing several operations in such an order as is most convenient to attain some end." 2 S. Johnson, *A Dictionary of the English Language* (1755). This "largest sense" is the only definition Johnson provides for "method." Judge Katsas notes that "[o]ther dictionaries" also "indicate that 'manner' is synonymous with 'method' as well as 'mode.'" Concurring Op. 4 (Katsas, J.). These dictionaries, however, are not referring to the narrow sense of "method" employed in the execution context.

4

is also frequently used to refer to granular details, including in the FDPA itself. In a provision governing aggravating factors in homicide cases, the statute reads, "In determining whether a sentence of death is justified …, the jury … shall consider … [whether] [t]he defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim." 18 U.S.C. § 3592(c)(6). In this instance, the "manner" of committing homicide refers not to the general method of killing, but to the precise way in which the offense was committed.

State legislatures also use the word "manner" to refer to the specifics of an execution procedure, including in some statutes the choice of lethal substance or method of injection. *See, e.g.*, Miss. Code. Ann. § 99-19-51 ("The manner of inflicting the punishment of death shall be by the sequential intravenous administration of a lethal quantity of the following combination of substances …."); Md. Code Ann., Correctional Services, § 3–905 (repealed in 2013) ("The manner of inflicting the punishment of death shall be the continuous intravenous administration of a lethal quantity of an ultrashort-acting barbiturate or other similar drug in combination with a chemical paralytic agent."); Colo. Rev. Stat. Ann. § 18-1.3-1202 ("The manner of inflicting the punishment of death shall be by the administration of a lethal injection …. For the purposes of this part 12, 'lethal injection' means a continuous intravenous injection of a lethal quantity of sodium thiopental or other equally or more effective substance.").

Similarly, federal courts use the term "manner" variably to refer both to the method of execution and to the specifics of execution procedures. *See Glossip v. Gross*, 135 S. Ct. 2726, 2741 (2015) ("[T]here is no scientific literature addressing the use of midazolam as a manner to administer lethal injections in

5

humans." (quoting a party's expert report)); *id.* at 2790 (Sotomayor, J., dissenting) ("These assertions were amply supported by the evidence of the manner in which midazolam is and can be used."); *Baze v. Rees*, 553 U.S. 35, 57 (2008) (plurality opinion) ("[T]he Commonwealth's continued use of the three-drug protocol cannot be viewed as posing an 'objectively intolerable risk' when no other State has adopted the one-drug method and petitioners proffered no study showing that it is an equally effective manner of imposing a death sentence."); *Holden v. Minnesota*, 137 U.S. 483, 491 (1890) ("[The state statute] prescribes … the manner in which[] the punishment by hanging shall be inflicted."); *Williams v. Hobbs*, 658 F.3d 842, 849 (8th Cir. 2011) ("The prisoners next contend that they have demonstrated a facially plausible claim that the Act [which provides for lethal injection in all cases] … increases mental anxiety before execution since the prisoners cannot know the manner in which they will be executed.").[2] These examples demonstrate that the word "manner" is used

---

[2] *See also Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 474 (1947) (Burton, J., dissenting) ("The Supreme Court of Louisiana has held that electrocution, in the manner prescribed in its statute, is more humane than hanging."); *In re Kemmler*, 136 U.S. 436, 443–44 (1890) ("'[T]he application of electricity to the vital parts of the human body, under such conditions and in the manner contemplated by the statute, must result in instantaneous, and consequently in painless, death.'" (citation omitted)); *Harris v. Dretke*, No. 04-70020, 2004 WL 1427042, at *1 (5th Cir. June 23, 2004) ("David Harris appeals the dismissal of his suit … challenging the manner in which the State of Texas intends to carry-out his execution by lethal injection.").

6

frequently in the execution context as a broad term that may encompass any level of detail.[3]

2.

To determine the level of specificity of "manner" as used in the FDPA, I start with the language of Section 3596. Recall the statute provides that the U.S. Marshal "shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). In this context, "manner" does not operate in isolation, but is modified by the requirement that the Marshal adopt the manner "prescribed by the law of the State." The district court did not address this qualifying language, and both parties gloss over it. In defending the 2019 protocol, the government contends that the Marshal must apply only the state's *method* of execution, without reference to other details that might be included in state law; the plaintiffs contend that the Marshal must apply *all* state procedures, again without reference to whether those procedures were prescribed by state law. The government's distinction is not found anywhere in the FDPA, while the plaintiffs' interpretation would read the phrase "prescribed by … law" out of the statute entirely.

The ordinary meaning of "law of the State" refers to binding law prescribed through formal lawmaking procedures. In analogous contexts, the Supreme Court has read similar statutory language to incorporate only statutes and regulations carrying the force of law. For instance, the Court held in *United*

---

[3] As the question before us concerns the meaning of the FDPA and whether "manner" can include procedural details prescribed by state law, it is of no consequence that the Supreme Court recognized constitutional challenges to the procedural details of execution only relatively recently. *See* Concurring Op. 11–12 & n.6 (Katsas, J.).

7

*States v. Howard* that a Florida regulation was part of the "law of the state" because violations of the regulation were "punishable as a misdemeanor." 352 U.S. 212, 216–17, 219 (1957). In *Chrysler Corporation v. Brown*, the Court held that the phrase "authorized by law" encompasses "properly promulgated, substantive agency regulations" that "have the 'force and effect of law.'" 441 U.S. 281, 295–96 (1979); *see also Baltimore & O.R. Co. v. Baugh*, 149 U.S. 368, 398 (1893) ("'[T]he equal protection of the laws,' … means equal protection not merely by the statutory enactments of the state, but equal protection by all the rules and regulations which, having the force of law, govern the intercourse of its citizens with each other and their relations to the public."); *Samuels v. Dist. of Columbia*, 770 F.2d 184, 199 (D.C. Cir. 1985) ("[T]hose federal regulations adopted pursuant to a clear congressional mandate that have the full force and effect of law … have long been recognized as part of the body of federal law."). The Supreme Court has emphasized that something is "prescribed by law" when it includes binding requirements. *Cf. United States v. Rodriquez*, 553 U.S. 377, 390–91 (2008) (holding that the phrase "maximum term of imprisonment … prescribed by law" refers to the statutory maximum, not the maximum set by sentencing guidelines, which do not bind a judge in all circumstances). Consistent with the deep-rooted conception of law as fixed and binding, I have not found, nor did the plaintiffs cite, any case in which the Supreme Court or this court has held that an informal policy or protocol was prescribed by law.[4]

---

[4] Judge Tatel argues that the four state execution protocols at issue in this case are in fact part of the "manner prescribed by the law of the State" because they were adopted pursuant to state statutes that "delegate to state prison officials the task of developing specific execution procedures." Dissenting Op. 2. In other words, because

8

In light of the FDPA's requirement that the manner of execution be prescribed by state "law," the district court's expansive interpretation of Section 3596(a) fails because it includes state procedures regardless of whether they are part of state "law." *See Matter of Fed. Bureau of Prisons' Execution Protocol Cases*, No. 12-CV-0782, 2019 WL 6691814, at *6 (D.D.C. Nov. 20, 2019) (citing informal execution policies from Texas, Missouri, and Indiana). The FDPA simply does not require the U.S. Marshal to follow aspects of a state execution procedure that were not formally enacted or promulgated. "[P]rescribed by the law of the State" sets an outer boundary on what the federal government must follow. On the other hand, the statutory command also means that the federal government cannot look only to the "method" of execution prescribed by the state. The interpretation adopted by Judge Katsas and the government does not account for other details that might be included in state law and formal regulations. While, as discussed below, formal state law often

---

"'by law,' each state directed its prison officials to develop execution procedures, and 'by law,' those officials established such procedures and set them forth in execution protocols," Judge Tatel contends that the protocols are subsumed within the phrase "prescribed by … law." *Id.* at 4–5. Yet neither the Supreme Court nor our court has ever adopted such a capacious understanding of "law." Instead, the Supreme Court has directed that we ask whether a protocol has the "force and effect of law," *Chrysler*, 441 U.S. at 295–96, and not everything an official does pursuant to his statutory authority carries the force of law. For instance, agencies issue interpretive rules pursuant to their statutory authority, yet interpretive rules emphatically do not carry the force of law. *See, e.g.*, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015). Indeed, the Supreme Court explicitly said in *Chrysler* that neither "[a]n interpretive regulation [nor] general statement of agency policy" can be considered an "authorization by law" because they lack "the binding effect of law." 441 U.S. at 315–16 (alterations omitted).

9

specifies little more than the method of execution, the federal government is nonetheless bound by the FDPA to follow the level of detail prescribed by state law.[5]

The textual context of Section 3596(a) supports this interpretation. Section 3596(a) provides that the Marshal "shall supervise *implementation of the sentence* in the manner prescribed by the law of the State." 18 U.S.C. § 3596(a) (emphasis added). This broad language encompasses more than earlier federal death penalty statutes, which incorporated state law only to define the "manner of inflicting the punishment of death." *See* An Act to Provide for the Manner of Inflicting the Punishment of Death § 323, 50 Stat. 304, 304 (June 19, 1937); An Act for the Punishment of Certain Crimes § 33, 1 Stat. 112, 119 (Apr. 30, 1790). The ordinary meaning of "implementation of the sentence" includes more than "inflicting the punishment of death." The latter refers to the immediate action of execution, whereas "implementation of the sentence" suggests

_____

[5] Judge Katsas claims that the "participial phrase 'prescribed by the law of the State' functions as an adjective," and adjectives usually "do not expand the meaning of the noun they modify." Concurring Op. 19 (Katsas, J.). This argument begs the question: It makes sense only if we presume that the word "manner" refers exclusively to the general method. But there is no evidence of such an exclusive meaning. Rather, as cases and statutes demonstrate, the word "manner" is broad enough to encompass execution procedures at every level of generality. The phrase "prescribed by the law of the State" actually *narrows* the meaning of the word "manner." Thus, my reading is consistent with the most common grammatical function of a participial phrase.

10

additional procedures involved in carrying out the sentence of death.[6]

In the death penalty context, the term "implementation" is commonly used to refer to a range of procedures and safeguards surrounding executions, not just the top-line method of execution. This is true of DOJ's regulations, which were promulgated during a period when no statute specified procedures for the federal death penalty. DOJ's 1993 execution regulation bears the title, "Implementation of Death Sentences in Federal Cases." *See* 58 Fed. Reg. 4,898 (Jan. 19, 1993). That regulation governs very minute aspects of executions, including the "[d]ate, time, place, and method," whether and when the prisoner has access to spiritual advisors, and whether photographs are allowed during the execution. *Id.* at 4,901–902. Likewise, the 2019 addendum to DOJ's execution protocol, which governs some of the procedures at issue in this case, is titled, "Federal Death Sentence Implementation Procedures." Department of Justice, Addendum to BOP Execution Protocol, Federal Death Sentence Implementation Procedures 1 (July 25, 2019) ("BOP Addendum"). As with the 1993 regulation, the addendum governs minute details, such as the numbering and labeling of syringes. *Id.* at 2. According to DOJ regulations and protocols, all of these details fall under the umbrella of implementing a death sentence. The breadth of the term "implementation" further undermines the government's narrow interpretation that "manner" means only the "method" of execution, irrespective of the requirements of state law.

---

[6] *Compare Implementation Plan*, Black's Law Dictionary (10th ed. 2014) ("An outline of steps needed to accomplish a particular goal."), *with Inflict*, Merriam-Webster's Collegiate Dictionary (11th ed. 2014) ("[T]o cause (something unpleasant) to be endured.").

11

An interpretation requiring the federal government to follow all procedures prescribed by state statutes and formal regulations, but no more, similarly coheres with the statute's directive that the Marshal "supervise" implementation of the sentence. 18 U.S.C. § 3596(a). To "supervise" is to "superintend" or "oversee." *See Supervise*, Merriam Webster's Collegiate Dictionary (11th ed. 2014). The concept of supervision does not fit with DOJ's position that it may establish a uniform protocol for all procedures short of the method of execution specified by state law. In the context of executing the law, supervision must occur within legal boundaries. While supervision often includes a degree of discretion, it does not include authority to create new law or to act in contravention of law. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588 (1952) (emphasizing that "the President's power to see that the laws are faithfully executed" does not include the power to "make laws which the President is to execute"). Elsewhere, Congress used more active language. In the 1937 statute, for instance, the Marshal was "charged with the execution of the sentence," 50 Stat. at 304, and other provisions of the FDPA refer to "carr[ying] out" an execution. *See* 18 U.S.C. § 3596(b), (c). Congress's choice in Section 3596(a) to provide only that the Marshal will "supervise" implementation hardly suggests that DOJ was given the authority to dictate nearly every aspect of the execution procedure regardless of what state law prescribes.

At the same time, the statute's use of "supervise" suggests that the Marshal enjoys a certain degree of discretion in the absence of state law on a particular question. If the FDPA had provided only that the Marshal "shall implement" the sentence according to state law, there would be less support for the idea that the Marshal has discretion to fill gaps in a state's execution law. Instead, the statute affords the Marshal a measure of supervisory discretion within the bounds of state law.

12

The FDPA specifies one exception to the general rule that the federal government must follow state law—the federal government may choose state or federal facilities for executions, irrespective of state law. Section 3597(a) addresses the question of where executions will take place and which facilities the Marshal may use. It provides that the Marshal "may use appropriate State or local facilities," so long as the Marshal "pay[s] the costs thereof." 18 U.S.C. § 3597(a)*.* This language establishes that the Marshal has discretion to choose between state and federal facilities, notwithstanding any state law requiring executions in a particular location. Under familiar canons of construction, the more specific provision controls the general. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (noting this canon "is a commonplace of statutory construction" (citation omitted)). Section 3596(a) directs the government to follow a state's death penalty law generally, while Section 3597(a) is best read as an exception, specifying one aspect of the execution process by allowing the federal government a choice of location. *See id.*[7]

Finally, this fuller reading of the statutory text coheres with the FDPA and the apparent balance Congress struck between providing for a federal death penalty and respecting provisions of state law. If "prescribed by the law of the State" includes only a state's statutes and formal regulations, the Marshal will be able to identify the requirements of state law. Nothing in the FDPA suggests that the federal government must incorporate most or all procedures and practices found in a state's informal execution policies, which could raise practical, and perhaps insurmountable, difficulties to the

---

[7] While it is true that Section 3597 is not written explicitly as an exception, *see* Concurring Op. 13 (Katsas, J.), it provides specific authority that supersedes the general reliance on state law.

13

implementation of federal death sentences. For instance, at least some state protocols are not publicly available. *See* Ark. Code Ann. § 5-4-617(i)(1)(C). Others are "revised as needed" through informal means. *See* Indiana State Prison Facility Directive, ISP 06-26: Execution of Death Sentence 14 (Jan. 22, 2014). When Congress used the term "prescribed by the law of the State," it did not mean secret policies and constantly changing informal protocols.[8]

In this politically charged area, Congress enacted a federalist scheme, incorporating state law as to the "manner" of death penalty implementation, but only for those execution procedures enacted or promulgated by states as part of their binding law. The FDPA leaves the federal government free to specify details regarding execution procedures, as it did in its protocol and addendum, subject to any contrary requirements of state law.

---

[8] This interpretation is largely consistent with other courts to have considered the issue. The Fifth Circuit upheld a death sentence under an earlier version of DOJ's protocol because nothing in the protocol was "inconsistent with Texas law." *United States v. Bourgeois*, 423 F.3d 501, 509 (5th Cir. 2005). The only source of law the court considered was Texas's criminal code, *id.*, which does not provide for specific procedures or designate a lethal substance. *See* Tex. Code Crim. Proc. Ann. art. 43.14. Similarly, the District of Vermont held that a U.S. Marshal is "to adopt local state procedures for execution," but the court looked only to state statutes in defining the state's procedures. *See United States v. Fell*, No. 5:01-CR-12-01, 2018 WL 7270622, at *4 (D. Vt. Aug. 7, 2018); *but see Higgs v. United States*, 711 F. Supp. 2d 479, 556 (D. Md. 2010) (declining to reach the Section 3596(a) question, but briefly suggesting in dicta that "manner" refers only to lethal injection).

14

B.

DOJ attempts to use previous federal death penalty statutes to show that "manner" must mean "method." A review of these statutes, however, demonstrates that Congress was at best silent as to whether the word had a specialized meaning. Prior federal execution statutes support neither the government's "manner means method only" interpretation, nor the plaintiffs' "manner means everything" interpretation. Rather, the history shows Congress uses "manner" in its ordinary sense, such that the scope of the term's application depends on the context.

There were only two federal statutes regulating execution procedures prior to the FDPA, and neither suggested that "manner" refers exclusively to general methods. The first federal death penalty statute, passed in 1790, read, "the manner of inflicting the punishment of death, shall be by hanging the person convicted by the neck until dead." § 33, 1 Stat. at 119. That provision is entirely consistent with my interpretation: Congress, using a broad word that can refer to any level of generality, chose on that occasion not to mandate further details. In another section of the same statute Congress used the word "manner" in a highly granular sense. The 1790 statute criminalized the maiming of a person in any of six enumerated "manners"—a list so particularized that "slit[ting] the nose" and "cut[ting] off the nose" were listed separately. § 13, 1 Stat. at 115. Reading the 1790 statute as a whole, Congress used the word "manner" to refer to both general methods and specific details, reinforcing that the term "manner" in isolation has a flexible meaning and must be read in context to determine the appropriate level of specificity.

Judge Katsas argues that the 1790 statute should be read against the backdrop of English common law. Concurring Op. 4 (Katsas, J.). As he notes, Blackstone wrote that the

15

punishment for many capital crimes was to be "hanged by the neck till dead." 4 W. Blackstone, *Commentaries on the Laws of England* 370 (1769). Notably, Blackstone does not say that hanging by the neck was the "manner" of execution. He says that hanging was the "judgment" pronounced by the court. *Id.* Indeed, this passage never uses the word "manner." Later, Blackstone wrote that a "sheriff cannot alter the manner of the execution by substituting one death for another." *Id.* at 397. Nor could the king substitute one death for another—for instance, by "altering the hanging or burning into beheading." *Id.* at 397–98. Nothing in this passage suggests that the choice of general method was the only detail encompassed by the term "manner of the execution." At most, this passage shows that changing the general method was one way to change the manner of execution.

Judge Katsas's reliance on two Supreme Court cases from the nineteenth century is similarly unavailing. First, *Wilkerson v. Utah*, 99 U.S. 130 (1878), simply paraphrased the language of the 1790 statute, *see id.* at 133 ("Congress provides that the manner of inflicting the punishment of death shall be by hanging."), so it adds no support for the narrow reading of "manner." Next, Judge Katsas argues that the Supreme Court used "manner" and "method" interchangeably in *Kemmler*, 136 U.S. 436. Yet nothing in the Court's opinion indicates that the two terms are synonymous. To the contrary, the opinion strongly suggests that the term "manner" encompasses more than the general method. In rejecting a petition for habeas corpus, the Court quoted the New York Court of Appeals at length, including its conclusion that the general method of electrocution is painless—not necessarily as a general matter, but when performed "under such conditions and in the manner contemplated by the statute." *Id.* at 443–44 ("[T]he application of electricity to the vital parts of the human body, under such conditions and in the manner contemplated by the statute, must

16

result in instantaneous, and consequently in painless, death." (citation omitted)). The term "manner" in that sentence must refer to details more specific than the general method of electrocution. *Id.*[9] Even if at points *Wilkerson* and *Kemmler* refer to hanging and electrocution as manners of execution, they are still consistent with the ordinary meaning of "manner," which can refer to the general and the specific. It is not unusual for courts to refer to hanging or lethal injection as manners of execution, just as courts commonly use "manner" to refer to specific details of an execution procedure. *See supra* at 4–5.

The government also relies on the 1937 statute to argue that "manner" is used in the FDPA to refer only to the method of execution. *See* DOJ Br. 21–22 ("Congress [in 1937] preserved the meaning of 'the manner' as synonymous with 'the method' of execution."). In the 1937 statute, Congress shifted away from the earlier federal death penalty regime to one that required the federal government to adopt whatever "manner" was "prescribed by the laws of the State." 50 Stat. at 304. The 1790 and 1937 statutes thus had different structures, one specifying a single method of federal execution and the other leaving the manner of execution to be determined by state law. This fundamental change to the statutory scheme undermines DOJ's contention that Congress forever settled the

---

[9] I agree with Judge Katsas that the level of detail in the New York statute is not relevant in itself. Concurring Op. 6 n.2 (Katsas, J.); *see also* Chapter 489, Laws of the State of New York §§ 492, 505–07 (June 4, 1888) (regulating execution timing, location, and personnel, among other things). Indeed, my analysis consistently maintains that the meaning of the word "manner" does not change whenever a legislature chooses to specify more or less detail in a given statute, whether a state statute or the FDPA. Regardless of how detailed the statute was, the Supreme Court in *Kemmler* used the word "manner" to encompass more than the general method of electrocution. *See* 136 U.S. at 443–44.

17

scope of federal death penalty legislation in 1790 when it chose hanging as the method of execution. Indeed, the fact that Congress amended the legally operative text suggests that the 1937 Act did not use "manner" in precisely the same way as the 1790 statute. *See Hall v. Hall*, 138 S. Ct. 1118, 1128 (2018) (stating that a statute "brings the old soil with it" only when "obviously transplanted"); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562, 1578 (2016) (Thomas, J., concurring) ("[W]hen Congress enacts a statute that uses different language from a prior statute, we normally presume that Congress did so to convey a different meaning."). Statutory predecessors can help us to interpret a modern statute, but we must respect the changes Congress enacted.

For the same reasons discussed with respect to the FDPA, the phrase "manner prescribed by the laws of the State" in the 1937 statute is best read as referring to all execution procedures found in the state's "law." In practice, moreover, the federal government incorporated more than the state's method of execution when it carried out executions under the 1937 statute. The government concedes that nearly all executions conducted under the 1937 statute took place in state facilities. Oral Argument at 3:30. Presumably, those executions were carried out in accordance with state law and possibly with other state procedures. DOJ notes that three executions under the 1937 statute took place in federal facilities, but DOJ is unable to identify a single way in which the executions were otherwise inconsistent with state law. As in the FDPA, the 1937 statute gave the U.S. Marshal discretion over the choice of facilities. *See* 50 Stat. at 304. Thus, the choice of a federal location does not undermine the requirement that the manner of execution follow whatever details are prescribed by state law.

Not only did the federal government perform the vast majority of executions in state prisons, DOJ has suggested on

18

several occasions that it understood the 1937 statute to require compliance with state procedures. In its 1993 protocol, DOJ hypothesized that Congress might have repealed the 1937 statute because it "no longer wanted the federal method of execution dependent on procedures in the states, some of which were increasingly under constitutional challenge." 58 Fed. Reg. at 4,899 (discussing repeal of the 1937 statute in 1984). Similarly, Attorney General Janet Reno wrote shortly before the FDPA's enactment that the bill "contemplate[s] a return to an earlier system in which the Federal Government does not directly carry out executions, but makes arrangements with states to carry out capital sentences in Federal cases." *See* H.R. Rep. No. 104-23, at 22 (1995) (quoting Letter from Attorney General Janet Reno to Hon. Joseph R. Biden, Jr., at 3–4 (June 13, 1994)). While such sources are not determinative of the meaning of the FDPA, they demonstrate that the Department's narrow interpretation of the statute has hardly been consistent.[10]

---

[10] Judge Katsas also argues that between 1790 and 1937, "nobody [was] focused on subsidiary procedural details in the legal or policy debates over [] various execution methods." Concurring Op. 7 (Katsas, J.). Even assuming that assessment is correct, it has no bearing on the broader sense of "manner" or how it was used in the FDPA. This observation would be relevant only to the meaning of "manner" in statutes that do not specify the scope of the term's application. For example, if the FDPA said something like "the manner employed by the state," then we would have to determine, as Judge Katsas asks, "the level of detail at which [Section 3596(a)] operates." *Id.* at 1. Yet the FDPA explicitly specifies the level of detail—it is the level of detail "prescribed by the law of the State." That leaves a question of what is included in the "law of the state," but it does not leave open the level of generality regarding the manner of execution.

19

Despite rejecting DOJ's historical evidence, I start from the same fundamental principle: that we should not "depart from the original meaning of the statute at hand." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019). As explained, the meaning of the word "manner" has always been broad, and its application has always depended on context. DOJ, however, asks us to go beyond established canons of interpretation: Rather than apply the original, broad sense of the word "manner," DOJ argues that the word should be deprived of its ordinary meaning because Congress chose on a single occasion in 1790 to specify one level of detail. There is no support for this novel approach.

In statutory interpretation as in ordinary usage, a word can have a fixed meaning even if, in application, it can refer to a variety of things. DOJ is confusing the sense of the word "manner" with the word's reference. A word's sense is its linguistic meaning, while its reference is the "actual thing in the world that the word picks out." Christopher R. Green, *Originalism and the Sense-Reference Distinction*, 50 St. Louis U. L.J. 555, 563 (2006). A single word with a fixed meaning can describe a wide range of references, depending on the factual context and how the word is used. *See id.* at 564; *cf. ConFold Pac., Inc. v. Polaris Indus., Inc.*, 433 F.3d 952, 957–58 (7th Cir. 2006) (explaining that the term "unjust enrichment" has multiple "referents" because it can refer to several factually distinct circumstances in which restitution is appropriate).[11] Rather than explore what the word "manner"

---

[11] Judge Katsas's only *linguistic* critique of the sense-reference distinction is that sense and reference arguably converge when dealing with proper names, Concurring Op. 8 n.3 (Katsas, J.), something that is completely irrelevant to this case. We both agree with Justice Scalia (and Professor Green, for that matter) that statutes have "a fixed meaning, which does not change." *Id.* That recognition

20

meant in 1790 (i.e., what sense it carried), DOJ focuses narrowly on which procedures Congress chose to require on one occasion (i.e., the reference of "manner"). According to DOJ, the word "manner" in 1994 cannot be broad enough to refer to specific procedures unless the 1790 statute also referred to specific procedures. But Congress's choice not to specify details like the length of the rope did not change the underlying meaning of the word "manner." The word "manner" was broad enough in 1790 to encompass more than the general method (as demonstrated by the statute's discussion of maiming), and the word retains that broad sense today. There is simply no reason to artificially cabin the word in later statutes so that it refers only to the same kinds of procedures required by Congress in 1790.

DOJ's ahistorical reading is also flatly inconsistent with the canons of interpretation governing incorporation. When Congress incorporates a body of law in general terms, the incorporating statute "develops in tandem with the" body of law that was incorporated. *Jam v. Int'l Fin. Corp*., 139 S. Ct. 759, 769 (2019); *see also New Prime Inc.*, 139 S. Ct. at 539; 2B Sutherland Statutory Construction § 51:8 (7th ed.). For most of the last 80 years, Congress has chosen to incorporate state law rather than specify a manner of execution. As Judge Katsas explains, it was once true that most execution statutes did not "prescribe subsidiary 'procedural details.'" Concurring Op. 6 (Katsas, J.). Today, however, some "state statutes and regulations do contain many granular details." *Id.* at 21. When a state legislature chooses to define the manner of execution in more detail than was common in older statutes, the FDPA directs the federal government to follow suit. *See New Prime*

---

does nothing to undermine the commonly accepted distinction between a word's meaning and the thing the word refers to on a given occasion.

21

*Inc.*, 139 S. Ct. at 539 (explaining that statutes incorporating a general body of law must be read to incorporate "later amendments and modifications").[12]

The historical record is likewise inconsistent with the plaintiffs' assertion that the FDPA does not allow DOJ to adopt nationwide procedures. *See* Plaintiffs' Br. 23–24. It is true that Congress in 1937 replaced a uniform, nationwide approach with a requirement that the federal government follow the sentencing state's manner of execution. Nevertheless, neither the 1937 statute nor the FDPA requires that the federal government follow state practices not prescribed by law. The statutory history thus says nothing about whether the Department can create uniform procedures to fill gaps in state law, as the protocol and addendum do in this case.

---

[12] Failing to find support in the FDPA's text, history, or practice, DOJ tries to prop up its arguments with the 1937 statute's legislative history. This legislative history, however, did not run the Article I, section 7, gauntlet, and cannot determine a statute's meaning. Even for those who find legislative history persuasive, the evidence is thin. DOJ explains that the House Judiciary Committee twice used the word "method" to refer to executions by hanging, electrocution, and gas. H.R. Rep. No. 75-164, at 1 (1937). DOJ argues that because the Committee changed the word "method" to "manner" in the statute, it must have understood the two words to be synonymous. Yet the legislative history is silent about why the Committee made that choice in the final text of the FDPA. If we are playing the legislative history guessing game, another inference is perhaps more likely: that Congress chose to use a different word in order to convey a different meaning. *Cf. Allina Health Servs. v. Price*, 863 F.3d 937, 944 (D.C. Cir. 2017). Ultimately, however, legislative history is not the law, and the history from 1937 tells us little about what the 1937 statute meant, much less what the 1994 FDPA means.

22

In sum, the historical evidence does not suggest the term "manner" has the narrow meaning pressed by DOJ; neither does it support the plaintiffs' conclusion that the federal government may not create national procedures that govern in the absence of any state law. Rather, for over 200 years, Congress has used the term "manner" flexibly, with the word's scope clarified by additional specifying language—"hang[ing] by the neck," slit[ting] the nose, and "prescribed by the law of the State." In light of this history, the best interpretation follows the plain meaning of the FDPA, which specifies that "manner" is whatever is prescribed by state law. This interpretation respects Congress' decision to create a federal death penalty that relies on federalism. The FDPA requires DOJ to follow the procedures set forth in state laws and regulations but does not foreclose federal protocols that apply in areas not addressed by state law.

C.

The Department raises a parade of horribles if "manner" is read to include more than the method of execution. Specifically, DOJ argues that a broader reading will make it much more difficult to execute prisoners and will leave the federal government unable to choose the most humane execution procedures. The government's purpose-driven arguments rely on broad policy goals and practical difficulties, rather than the plain meaning of the text. These policy arguments, however valid, cannot overcome Congress's plain choice in the FDPA to allow the manner of execution to turn on state law.[13]

---

[13] Judge Katsas suggests that arguments about consequences are relevant to "help resolve textual ambiguity." Concurring Op. 16 n.8 (Katsas, J.). Yet the word "manner" as used in Section 3596 is not

23

DOJ's concerns are rooted in what the Department deems to be the purposes of the FDPA. DOJ Br. 15; *see also* Concurring Op. 13 (Katsas, J.) (discussing one purpose of the FDPA "to ensure a workable and expanded system of capital punishment"). As a court, however, "our function [is] to give the statute the effect its language suggests," not to further whatever "admirable purposes it might be used to achieve." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 270 (2010). DOJ urges us to give the FDPA the interpretation producing what it believes would be the most effective execution regime, but to do so would ignore both the limited nature of our judicial function and the realities of legislative deliberation:

> [N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.

*Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 646–47 (1990) (citation and quotation marks omitted).

---

ambiguous. Rather, as already explained, the ordinary meaning of the word "manner" is broad and flexible, but as qualified in the FDPA, the "manner" of execution is unambiguous: It is whatever "manner" is prescribed by applicable state law. *See supra* at 6–8; *see also Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980) ("Broad general language is not necessarily ambiguous"). Speculations about congressional intent are rarely illuminating, particularly when, as here, the text of the statute provides the relevant level of specificity.

24

In the FDPA, Congress incorporated state law instead of directing DOJ to promulgate a uniform protocol. This suggests that Congress was balancing at least two competing values: the need to effectively implement federal death sentences and an interest in federalism. Perhaps Congress simply decided to duck controversial specifics by leaving some questions to state law. Whatever the reason, statutes strike a bargain and must be enforced in their details, not in their lofty goals. After all, "[i]f courts felt free to pave over bumpy statutory texts in the name of more expeditiously advancing a policy goal, we would risk failing to take account of legislative compromises essential to a law's passage and, in that way, thwart rather than honor the effectuation of congressional intent." *New Prime Inc.*, 139 S. Ct. at 543 (quotation marks and alterations omitted). We should decline DOJ's invitation to question the bargain Congress struck here. To the extent more detailed state statutes raise additional interpretive questions, that is an unavoidable consequence of the incorporation of state law. Unless and until Congress amends the FDPA, DOJ is bound to "follow its commands as written, not to supplant those commands with others it may prefer." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018). We have no license to read into the FDPA a limitation on "manner" that has no basis in the text and to read out of the statute its incorporation of state law.

In addition, DOJ's policy concerns about administrability would have applied with equal force in 1937, when Congress first incorporated state law to govern the manner of federal executions. *See New Prime Inc.*, 139 S. Ct. at 539 ("[I]t's a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary ... meaning ... at the time Congress enacted the statute." (quotation marks omitted)). In 1937, permissible execution methods varied significantly across the country and included hanging, electrocution, the gas chamber, and others. State

25

execution methods also differed, albeit to a lesser extent, when the FDPA was passed in 1994. Thus, even under DOJ's interpretation that "manner" means only method, until recently the federal government would have had to apply varying execution methods on a state-by-state basis. DOJ claims that state-by-state administration is unworkable, but state-by-state administration has indisputably been a feature of this statutory framework since 1937. A uniform method is possible under DOJ's interpretation only because all the death penalty states have made independent choices since the FDPA's enactment to adopt the method of lethal injection.

Similarly, the federal government has never had absolute license to choose the most humane execution procedures. When Congress passed the 1937 statute, it chose state practice over hanging in part because "[m]any States"—but not all— "use[d] more humane methods of execution, such as electrocution, or gas." H.R. Rep. No. 75-164, at 1 (1937). Congress could have selected one of those more humane methods instead of hanging, but it chose to leave that decision to the states—many of which continued to hang criminals. *See Andres v. United States*, 333 U.S. 740, 745 (1948) (noting that the "method of inflicting the death penalty" in Hawaii in 1948 was "death by hanging"). Indeed, some states continued to provide for hanging even after the passage of the FDPA in 1994. *See Baze*, 553 U.S. at 43 n.1 (plurality opinion) (noting that New Hampshire and Washington still allowed for hanging in 2008). Even under DOJ's interpretation of the FDPA, the government may choose what it considers to be the most humane procedures only when state law does not provide for another method of execution. Whatever the legitimacy of

26

DOJ's concerns, they are necessary features of the statute Congress enacted.[14]

In any event, as a practical matter, my textual interpretation of the FDPA mitigates many of the concerns raised by the district court's broad reading. The FDPA's reliance on state law leaves ample scope for DOJ to follow its federal execution procedures and protocols. Few of the procedural details cited by the plaintiffs appear to carry the force of law, so the federal government need not follow them. State execution statutes tend to be rather brief, specifying lethal injection without adding further details. For example, none of the four states at issue in this case have statutes precluding the use of pentobarbital. *See* Tex. Code Crim. Proc. Ann. art. 43.14 (calling for lethal injection without specifying which chemical to be used); Ark. Code Ann. § 5-4-617 (allowing lethal injection using either a barbiturate like pentobarbital or a three drug solution); Ind. Code § 35-38-6-1 (calling for lethal injection without specifying which chemical must be used); Mo. Ann. Stat. § 546.720 (calling for lethal injection without specifying which chemical must be used).

---

[14] Like the DOJ, Judge Tatel invokes the FDPA's goal of ensuring more humane executions, but to support the opposite interpretation. He argues that reading "prescribed by the law of the State" to exclude non-binding state execution protocols would "defeat section 3596(a)'s purpose—to make federal executions more humane by ensuring that federal prisoners are executed in the same manner as states execute their own." Dissenting Op. 8. Yet that argument deprives the phrase "prescribed by … law" of all meaning. If Congress had intended the federal government to incorporate all of the state's execution procedures, it would have said so. Instead, Congress chose to incorporate only the manner prescribed by state law.

27

Indeed, I have not been able to locate statutes or formal regulations in any state that would prevent the federal government from using pentobarbital, the drug currently specified in DOJ's protocol addendum. In the rare cases where state law provides for a particular substance, states generally either include pentobarbital on the list of permitted substances, *see* 501 Ky. Admin. Regs. 16:330 (allowing either pentobarbital or thiopental sodium), or include a general provision allowing any equally effective substance, *see* Utah Admin. Code r. 251-107-4 (providing for "a continuous intravenous injection, one of which shall be of a lethal quantity of sodium thiopental or other equally or more effective substance to cause death").

More specific details are generally found in informal state policies and protocols. Execution protocols are exempted from many states' administrative procedure acts, including their formal rulemaking requirements. *See, e.g.*, Ark. Code Ann. § 5-4-617(h); *Middleton v. Mo. Dep't of Corr.*, 278 S.W.3d 193, 195–97 (Mo. 2009); *Porter v. Commonwealth*, 661 S.E.2d 415, 432–33 (Va. 2008); *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 312 (Tenn. 2005). Even in states that provide for formal rulemaking, execution protocols tend to be informal and non-binding. Consider Indiana, the state designated by DOJ whenever the sentencing state does not provide for the death penalty. Indiana allows its department of corrections to adopt rules under the state's formal rulemaking provisions to implement its execution statute. *See* Ind. Code § 35-38-6-1(d). Yet the state's current execution procedures were not promulgated under that statute and do not purport to carry the force of law. *See* Indiana State Prison Facility Directive, ISP 06-26: Execution of Death Sentence 14 (Jan. 22, 2014) (noting that Indiana's protocol is "revised as needed," not under the state's formal rulemaking procedures, but in accordance with the department of corrections' policies). Similarly, both

28

Arkansas' and Missouri's protocols permit the director of the department of corrections to modify certain aspects of the execution procedures. *See* Missouri Department of Corrections, Preparation and Administration of Chemicals for Lethal Injection 1 (Oct. 18, 2013); Arkansas Lethal Injection Procedure 3 (Aug. 6, 2015), https://bit.ly/2ExLkTE. A state execution protocol that explicitly allows the department of corrections to depart from the protocol's requirements on a case-by-case basis cannot be said to be binding. Given that most details found in state execution protocols are not prescribed by law, DOJ will be able to make most procedural choices regarding federal executions.[15]

## II.

Based on this interpretation of Section 3596(a), I would hold that the 2019 protocol did not exceed the government's authority under the FDPA. As an initial matter, the protocol is unlikely to conflict with state law in most cases, as state laws

---

[15] Judge Tatel does not dispute that the four protocols at issue were not promulgated through formal rulemaking procedures. Instead, he attempts to cabin *Chrysler*'s holding to its facts, ignores the consistent line of cases requiring "law" to have binding effect, *see supra* at 7 (collecting cases), and makes a general appeal to examining "context" when determining whether a regulation issued outside a formal rulemaking process constitutes "law." Dissenting Op. 7–8. Judge Tatel, however, fails to identify a single case supporting his theory that non-binding protocols can qualify as "law" in *any* context—despite the fact that, as Judge Tatel emphasizes, "prescribed by law" or similar language appears at least 1,120 times in the United States Code. *Id.* at 7. As the Court explained in *Chrysler*, the question is simply whether these state protocols are binding on state officials. Because these protocols do not appear to have the binding force of law, they cannot be deemed part of the "law of the State."

29

usually address execution procedures only in general terms. *See supra* at 24–26. Should cases arise in which the protocol differs from state law—for example, in states with more detailed regulations governing executions, *see, e.g.*, 501 Ky. Admin. Regs. 16:330; Or. Admin. R. 291-024-0080—DOJ remains free to depart from the federal protocol. Indeed, the protocol provides explicitly that the Director may depart from its procedures in the face of superseding legal obligations— namely, when "necessary" to "comply with specific judicial orders" or when "required by other circumstances." BOP Addendum 1; *see also* Department of Justice, BOP Execution Protocol 4 (2019) ("Execution Protocol") ("These procedures should be observed and followed as written unless deviation or adjustment is required …."). In addition, the protocol directs BOP to "make every effort … to ensure the execution process … [f]aithfully adheres to the letter and intent of the law." Execution Protocol 4–5. These provisions indicate that the government must depart from the protocol as necessary to "adhere to the letter and intent of" the FDPA—including the requirement that the government apply the manner of execution prescribed by state law. Reading the protocol and addendum as a whole suggests that DOJ must follow state law, and not that the BOP Director is merely granted "discretion." Dissenting Op. 9. Because the 2019 protocol allows departures as needed to comply with state law, it is consistent with the FDPA.

Judge Tatel casts this reading of the protocol's plain text as an improper effort to "rewrite the protocol" to support an interpretation that the government has not advanced. Dissenting Op. 10. As an initial matter, my interpretation requires no revision—it rests on the words DOJ used in promulgating its protocol. Moreover, "[o]ur duty in conducting *de novo* review on appeal is to resolve the questions of law this case presents." *Citizens for Responsibility & Ethics in Wash. v. FEC*, 892 F.3d 434, 440 (D.C. Cir. 2018). "When an issue or

30

claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991); *see also U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446–47 (1993). Irrespective of the government's litigation strategy, the issue before us in this case is whether the 2019 protocol exceeds the government's authority under the FDPA, and it is entirely appropriate to conduct an independent assessment of all relevant materials—including, in particular, the text of the protocol—in order to fulfill our duty to say what the law is.

Because the district court's order was premised exclusively on the plaintiffs' claim that the protocol was "in excess of statutory … authority," 5 U.S.C. § 706(2)(C), I would vacate the preliminary injunction. I would further hold that the 2019 protocol is a "rule[ ] of agency organization, procedure, or practice" exempt from the APA's notice and comment requirements. *See* 5 U.S.C. § 553(b). The plaintiffs maintain we should not reach this claim before the district court has considered it. It is true that we ordinarily decline to resolve claims and arguments not addressed by the district court in deciding a preliminary injunction motion. *See Sherley v. Sebelius*, 644 F.3d 388, 397–98 (D.C. Cir. 2011). But if our holding on appeal makes a conclusion "inevitable" then "we have power to dispose [of a claim] as may be just under the circumstances, and should do so to obviate further and entirely unnecessary proceedings below." *Wrenn v. Dist. of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017) (cleaned up); *see also* 28 U.S.C. § 2106 (granting appellate courts authority to "direct the entry of … judgment … as may be just under the circumstances"). The plaintiffs' notice and comment challenge rises and falls with the merits of their FDPA claim—that the protocol is a procedural rule follows inescapably from my

31

conclusion that the protocol does not exceed DOJ's authority under the FDPA. Because the issues are intertwined and the plaintiffs' notice and comment challenge fails under my interpretation of the FDPA, it is entirely unnecessary for the district court to address this claim on remand.

"The critical feature of a procedural rule is that it covers agency actions that do not themselves alter the rights or interests of parties." *Nat'l Min. Ass'n*, 758 F.3d at 250 (quotation marks omitted). By its terms, the protocol does nothing to interfere with the Marshal's ability to comply with the FDPA or with the plaintiffs' right to have their sentences implemented "in the manner prescribed by the law of the State." 18 U.S.C. § 3596(a). To the contrary, the protocol simply lays out procedures for the federal government to follow in cases where state law does not address some aspect of the execution process. It directs the federal government in all cases "to ensure the execution process … [f]aithfully adheres to the letter and intent of the law," Execution Protocol 4–5, which necessarily includes following the FDPA's directive to implement death sentences in conformity with state positive law. As such, the protocol cannot be said to "impose [any] new substantive burdens," *Aulenback, Inc. v. Fed. Highway Admin.*, 103 F.3d 156, 169 (D.C. Cir. 1997), or to "alter the rights or interests of [affected] parties," *Nat'l Min. Ass'n*, 758 F.3d at 250 (citation omitted)—rather, any substantive burdens are derived from the FDPA and the state laws it incorporates.

Moreover, the procedures outlined in the 2019 protocol bear all the hallmarks of "internal house-keeping measures organizing [DOJ's] activities" with respect to preparing for and conducting executions. *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987) (citation omitted). The protocol and accompanying addendum provide lengthy "checklists for

32

pre-execution, execution and post execution procedures," Execution Protocol 4, including matters as specific as arranging food services for an inmate's final meal, *id.* at 17, "open[ing] the drapes covering the windows of the witness rooms" during an execution, *id.* at 24, and announcing the time of death "prior to the drapes being closed," *id.* at 25. DOJ's decision to promulgate detailed "written guidelines to aid [its] exercise of discretion" during the highly sensitive process of conducting executions should not come "at the peril of having a court transmogrify those guidelines into binding norms subject to notice and comment strictures." *Aulenback*, 103 F.3d at 169 (citation and quotation marks omitted). Because the protocol possesses the essential features of a procedural rule, the plaintiffs' notice and comment challenge also fails.

I would not reach the plaintiffs' argument that only the U.S. Marshal Service has the authority to promulgate rules under the FDPA. The plaintiffs did not develop this argument below, so it is forfeited. *See Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019) ("Absent exceptional circumstances, a party forfeits an argument by failing to press it in district court.").[16] I would also decline to reach the plaintiffs' claims under the Food, Drug & Cosmetic Act and the Controlled Substances Act, which were neither addressed by the district court nor pressed by the plaintiffs on appeal. Unlike the notice and comment challenge to the protocol, the outcome of the FDCA and CSA claims is not plainly dictated

---

[16] The evidence Judge Katsas relies on to conclude that this argument was not forfeited comes from a chart included in the factual background section of one plaintiff's preliminary injunction motion, summarizing the "Details of 2019 Protocol and Concerns That Are Implicated." *See* Pl.'s Mot. for Prelim. Inj., *Roane v. Barr*, No. 19-mc-0145, at 10 (D.D.C. Sept. 27, 2019). Such "fleeting reference[s]" do not a developed legal argument make. *Williams v. Lew*, 819 F.3d 466, 471 (D.C. Cir. 2016).

33

by my interpretation of the FDPA. Thus, it will be "for the district court to determine, in the first instance, whether the plaintiffs' showing on [these claims] warrants preliminary injunctive relief." *Sherley*, 644 F.3d at 398.

TATEL, *Circuit Judge,* dissenting: Plaintiffs Daniel Lee, Wesley Purkey, Alfred Bourgeois, and Dustin Honken do not challenge the federal government's authority to execute them. Instead, they argue that the Attorney General's plan for their executions—that is, the federal protocol—conflicts with section 3596(a) of the Federal Death Penalty Act of 1994 (FDPA), 18 U.S.C. §§ 3591 et seq. Section 3596(a) instructs U.S. Marshals to carry out federal death sentences by arranging for prisoners to be executed "in the manner prescribed by the law of the State" in which they were sentenced—or, if that state has no death penalty, the law of "another State" "designate[d]" by the sentencing judge. *Id.* § 3596(a). Notwithstanding its weighty subject matter, then, this case presents a classic question under the Administrative Procedure Act: whether an agency has acted "in accordance with law." 5 U.S.C. § 706(2)(A).

In defending the federal protocol, the government argues that the word "manner" in section 3596(a) refers only to the general execution method—e.g., lethal injection—not, as plaintiffs argue, to the procedures and techniques used to implement that method, e.g., substance administered or dosage. Because the government seeks no deference to its interpretation of the statute, *see* Oral Arg. Rec. 5:57–6:00 (confirming this), to prevail it must demonstrate not merely that its interpretation of section 3596(a) is reasonable, but that it "best effectuates the underlying purposes of the statute." *Vanguard Interstate Tours, Inc. v. ICC*, 735 F.2d 591, 597 (D.C. Cir. 1984).

I agree with Judge Rao that the term "manner" refers to more than just general execution method. Because her detailed opinion so thoroughly addresses the government's arguments and convincingly responds to Judge Katsas's survey of the historical record, I see no need to say anything more on the issue.

2

Beyond this, Judge Rao and I part company. She would hold that when carrying out executions under section 3596(a), the Attorney General must comply with state execution procedures set forth in "statutes and formal regulations," but not those in state execution protocols. Rao Op. at 1. She also reads the federal protocol to contain a "carveout" "indicat[ing] that the government must depart from the protocol as necessary to . . . apply the manner of execution prescribed by state law." *Id.* at 1, 29. The government, however, makes neither argument, and the protocol contains no such carveout. In my view, section 3596(a), best understood, requires federal executions to be carried out using the same procedures that states use to execute their own prisoners—procedures set forth not just in statutes and regulations, but also in protocols issued by state prison officials pursuant to state law. Because the federal protocol, on its face, takes no account of these procedures, it is contrary to section 3596(a), and I would vacate it. *See* 5 U.S.C. § 706(2)(A), (C) (requiring courts to "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right").

## A.

Plaintiffs were sentenced to be executed "in the manner prescribed by the law," 18 U.S.C. § 3596(a), of Arkansas, Missouri, Texas, and Indiana, respectively. All four states have enacted statutes that establish lethal injection as the method of execution and delegate to state prison officials the task of developing specific execution procedures. Pursuant to these statutes, state officials have adopted execution protocols that designate, among other things, the chemicals to be administered, dosages, procedures for vein access, and qualifications of execution personnel. State officials adopt such protocols not just to comply with state law, but also to ensure

3

that executions comply with the Constitution. *Cf. Baze v. Rees*, 553 U.S. 35, 55–56 (2008) (plurality opinion) (rejecting Eighth Amendment method-of-execution challenge "in light of" "important safeguards" contained in state execution protocol, including "that members of the [intravenous] team . . . have at least one year of professional experience" and specific vein-access procedures); *Raby v. Livingston*, 600 F.3d 552, 560 (5th Cir. 2010) (rejecting Texas inmate's Eighth Amendment claim because state execution protocol "mandates . . . that sufficient safeguards are in place to reduce the risk of pain below the level of constitutional significance").

For example, Texas's governing statute requires condemned prisoners to be "executed . . . by intravenous injection . . . , [with] such execution procedure to be determined and supervised by the director of the correctional institutions division of the Texas Department of Criminal Justice." Tex. Code Crim. Proc. Ann. art. 43.14(a). Pursuant to that statute, the Director "adopt[ed]" an "Execution Procedure," under which "100 milliliters of solution containing 5 grams of Pentobarbital" "shall be mixed . . . by members of the drug team," which, in turn, "shall have at least one medically trained individual," a term defined in the protocol. Texas Department of Criminal Justice, Correctional Institutions Division, Execution Procedure 2, 7–8 (Apr. 2019), Administrative Record (A.R.) 84, 89–90. The protocol further requires that intravenous lines be inserted by "a medically trained individual" who "shall take as much time as is needed" to do so "properly," and who is prohibited from employing a "cut-down" technique, a surgical procedure that exposes the vein. *Id.* at 8, A.R. 90.

The governing Missouri statute "authorize[s] and direct[s]" "the director of the department of corrections . . . to provide a suitable and efficient room or place . . . and the

4

necessary appliances" for carrying out lethal injections and requires "[t]he director . . . [to] select an execution team." Mo. Rev. Stat. § 546.720.1–2. Pursuant to that statute, the Director issued a protocol requiring prisoners to be executed using two five-gram doses of pentobarbital—quantities that "may not be changed without prior approval of the department director"— which "shall be injected into the prisoner . . . under the observation of medical personnel," namely, "a physician, nurse, and pharmacist." Missouri Department of Corrections, Preparation and Administration of Chemicals for Lethal Injection 1–2 (Oct. 18, 2013), A.R. 70–71.

The other two states—Arkansas and Indiana—have similar statutory schemes. *See* Ark. Code Ann. § 5-4-617 ("The director [of the Department of Correction] shall develop logistical procedures necessary to carry out the sentence of death, including . . . [e]stablishing a protocol for any necessary mixing or reconstitution of the drugs and substances set forth in this section in accordance with the instructions."); Ind. Code § 35-38-6-1 (authorizing "[t]he department of correction [to] adopt rules" to implement lethal-injection statute); *see also Kelley v. Johnson*, 496 S.W.3d 346, 352 (Ark. 2016) (discussing Arkansas's lethal injection protocol); Department of Correction, Indiana State Prison Facility Directive, ISP 06-26: Execution of Death Sentence 16–17 (Jan. 22, 2014), Mot. for Prelim. Inj. Barring the Scheduled Execution of Pl. Dustin Lee Honken, Ex. 6, *In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145 (D.D.C. Nov. 5, 2019).

The "law" of each state, then, requires executions to be implemented according to procedures determined by state corrections officials, who, in turn, have set forth such procedures in execution protocols. In other words, "by law," each state directed its prison officials to develop execution

5

procedures, and "by law," those officials established such procedures and set them forth in execution protocols. Accordingly, the protocols have been "prescribed by . . . law." 18 U.S.C. § 3596(a). Apparently agreeing, the government argues that interpreting "manner" to mean more than "method," as Judge Rao and I do, would require it to use the same drugs as the states—drugs "prescribed" in the relevant states' protocols, not in their statutes. *See* Appellants' Br. 29. Indeed, at oral argument government counsel rejected the notion that "the law of the State" excludes execution protocols, calling it "incongruous to think that Congress thought the degree of federal control over how to implement . . . a federal execution was going to depend on the happenstance of exactly where in its law or regulation or sub-regulatory guidance a state chose to write out very detailed procedures." Oral Arg. Rec. 39:12–32.

Were there any doubt about this, "the natural way to draw the line is in light of the statutory purpose," *Rose v. Lundy*, 455 U.S. 509, 517 (1982) (internal quotation marks and citation omitted), and here, interpreting section 3596(a) to include state execution protocols "best effectuates the underlying purposes of the statute," *Vanguard Interstate Tours*, 735 F.2d at 597. As Judge Rao points out, section 3596(a) replicates nearly word-for-word the statute that governed federal executions from 1937 to 1984. Like the FDPA, that statute required executions to be carried out in "the manner prescribed by the laws of the State within which the sentence [wa]s imposed," or, if that state had no death penalty, another state designated by the sentencing court. Act of June 19, 1937, ch. 367, 50 Stat. 304 (repealed 1984) ("1937 Act"). Central to the issue before us, Congress passed the 1937 Act because the states were undertaking serious efforts to make executions more humane. *See* H.R. Rep. 75-164 at 2 (1937) (letter from Attorney General Homer Cummings) (advising Congress that states "have

6

adopted more humane methods" of execution than hanging and recommending that "the Federal Government likewise . . . change its law in this respect"); *see also* Stuart Banner, *The Death Penalty: An American History* 171 (2002) (explaining that, as early as the 1830s, states had begun experimenting with execution procedures, endeavoring to "minimize the condemned person's pain"). Accordingly, almost all federal executions pursuant to the 1937 Act were carried out by state officials, who, supervised by U.S. Marshals, executed federal prisoners in the same "manner" as they executed their own. *See* Oral Arg. Rec. 15:00–03 (government counsel agreeing that most executions pursuant to the 1937 Act were carried out in state facilities); David S. Turk, *Forging the Star: The Official Modern History of the United States Marshals Service* 23–24 (2016) (describing how the U.S. Marshal arranged for Ethel and Julius Rosenberg to be executed at Sing-Sing Correctional Facility, then home to New York state's death row and electric chair).

By using virtually identical language in FDPA section 3596(a), Congress signaled its intent to continue the same system—for federal executions to be carried out in the same manner as state executions. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative . . . interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."). Given this, reading section 3596(a) to exclude state execution protocols, which set forth the very procedures states use to carry out executions humanely, would run contrary not only to section 3596(a)'s "'ultimate purpose[]'" of ensuring more humane executions, but also to "'the means [Congress] has deemed appropriate . . . for the pursuit of [that] purpose[]'"— requiring federal prisoners to be executed in the same manner as states execute their own. *Gresham v. Azar*, 950 F.3d 93, 101 (D.C. Cir. 2020) (quoting *MCI Telecommunications Corp. v.*

7

*American Telephone & Telegraph Co.*, 512 U.S. 218, 231 n.4 (1994)). And at least as recently as 2008, the states have "by all accounts" "fulfilled" their "role . . . in implementing their execution procedures . . . with an earnest desire to provide for a progressively more humane manner of death." *Baze*, 553 U.S. at 51.

Judge Rao argues that state execution protocols are not "prescribed by . . . law" within the meaning of section 3596(a) because they are not "formal regulations." Rao Op. at 1. In support, she cites *Chrysler Corp. v. Brown*, 441 U.S. 281 (1979), in which the Supreme Court considered a provision of the Trade Secrets Act that protected confidential information by prohibiting its disclosure unless "'authorized by law,'" *id.* at 294 (quoting 18 U.S.C. § 1905). The Court held that a regulation issued pursuant to an agency's "housekeeping" statute and without notice-and-comment procedures did not qualify as "law" under the Act. *Id.* at 309–16. From this, Judge Rao concludes that the word "law" in FDPA section 3596(a) is limited to regulations issued pursuant to notice-and-comment procedures. *See* Rao Op. at 7, 28 n.13.

By my count, the phrase "authorized by law" and its twin sisters—"prescribed by law" and "prescribed by the law"— appear 1,120 times in the United States Code, and the Supreme Court has repeatedly made clear that, even within the same statute, "the presumption of consistent usage 'readily yields' to context." *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 320 (2014) (quoting *Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007)). In *Chrysler*, moreover, it was only after closely examining "evidence of legislative intent," including statutory text and legislative history, that the Court limited "law" in the Trade Secrets Act to notice-and-comment regulations. 441 U.S. at 312. In other words, context matters, and here context requires a different result. Limiting "the

8

manner prescribed by the law of the State" to execution procedures contained in statutes and in regulations issued pursuant to notice and comment, and thereby excluding those contained in state execution protocols, would defeat section 3596(a)'s purpose—to make federal executions more humane by ensuring that federal prisoners are executed in the same manner as states execute their own.

Judge Rao also argues that the Attorney General need not follow state execution protocols because they "do not appear to have the binding force of law," "leav[ing] the federal government free to specify" its own procedures. Rao Op. at 2, 28 n.15. But whether state execution protocols are binding under *state* law has nothing to do with whether the Attorney General has authority under *federal* law to issue a uniform execution protocol. And as explained above, section 3596(a) shifts authority for determining how to "implement" death sentences to the states, leaving no comparable authority for the Attorney General. Indeed, apart from the Attorney General's authority to establish procedures unrelated to "effectuat[ing] the death," *see infra* at 12, the statute assigns the Attorney General just three narrow tasks: keeping custody of persons sentenced to death until they exhaust their appeals, 18 U.S.C. § 3596(a); releasing prisoners into Marshal custody for implementation of their death sentences, *id.*; and approving the amount Marshals may pay for the use of state facilities and personnel, *id.* § 3597(a).

**B.**

Of course, the federal protocol's failure to incorporate state execution procedures would pose no problem if, as Judge Rao believes, it contained a "carveout," "indicat[ing] that the government must depart from the protocol as necessary to . . .

9

apply the manner of execution prescribed by state law." Rao Op. at 1, 29. But it does not. In relevant part, the protocol states:

> The procedures utilized by the [Bureau of Prisons (BOP)] to implement federal death sentences shall be as follows unless modified *at the discretion of* the Director or his/her designee, as necessary to (1) comply with specific judicial orders; (2) based on the recommendation of on-site medical personnel utilizing their clinical judgment; or (3) *as may be required by other circumstances*.

Department of Justice, Addendum to BOP Execution Protocol, Federal Death Sentence Implementation Procedures 1 (July 25, 2019) (emphasis added).

Far from requiring Marshals to follow state law, this provision mentions neither state law nor section 3596(a), and it leaves the decision to "modif[y]" protocol procedures to "the discretion" of the BOP Director, *id.* Moreover, only the third justification for departing from the protocol—"other circumstances," *id.*—could possibly encompass inconsistent state law. But the government—which, after all, wrote the protocol—does not so argue. At most, the government suggests that it could exercise its residual discretion in accordance with state law, noting that "nothing in the federal protocol expressly precludes" "offer[ing] . . . a sedative" or having a physician present. Appellants' Br. 33 (referring to the two differences between the federal protocol and the relevant state protocols identified by the district court).

Where, as here, agency action is challenged under the Administrative Procedure Act, we can uphold the action only

10

on "[t]he grounds . . . upon which the record discloses that [it] was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). Throughout this litigation, the government has insisted that requiring it to comply with state law would be "perverse[]," Appellants' Br. 19, and would "hamstring" implementation of the federal death penalty, Reply Br. 13. We have no authority to rewrite the protocol to ensure it complies with the FDPA. "[A]gency policy is to be made, in the first instance, by the agency itself . . . . Courts ordinarily do not attempt . . . to fashion a valid regulation from the remnants of the old rule." *Harmon v. Thornburgh*, 878 F.2d 484, 494 (D.C. Cir. 1989). The problem with Judge Rao's interpretation of the protocol, then, is not just that it represents an "independent assessment" of the protocol's meaning, Rao Op. at 30, but more fundamentally that "it sustains a rule which the agency has never adopted at all," *Harmon*, 878 F.2d at 495 n.20.

## C.

I end with a few observations about the government's defense of the protocol.

First, had Congress intended to authorize the Attorney General to adopt a uniform execution protocol, "it knew exactly how to do so." *SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018). The year before Congress enacted the FDPA, then-Attorney General William Barr issued a regulation setting lethal injection as the uniform federal method of execution and authorizing the BOP Director to determine which chemicals to use. *See* Department of Justice, Implementation of Death Sentences in Federal Cases, 58 Fed. Reg. 4898, 4901–02 (Jan. 19, 1993) (codified at 28 C.F.R. § 26.3) (1993 Regulation). This regulation was a gap-filler: several years earlier, Congress had repealed the 1937 Act, leaving unclear how federal executions would be carried out.

11

While Congress was considering the bill that would become the FDPA, General Barr's successor, Attorney General Janet Reno, warned that section 3596(a)'s "proposed procedures contemplate a return to an earlier system"—i.e., the 1937 Act—"in which the Federal Government does not directly carry out executions, but makes arrangements with states to carry out capital sentences in Federal cases." H.R. Rep. No. 104–23, at 22 (1995) (quoting Letter of Attorney General Janet Reno to Honorable Joseph R. Biden, Jr., Detailed Comments at 3–4 (June 13, 1994)). She therefore recommended that Congress amend the bill "to perpetuate the current approach"—i.e., the 1993 Regulation—"under which the execution of capital sentences in Federal cases is carried out by Federal officials pursuant to uniform regulations issued by the Attorney General." *Id.* Despite this recommendation, "Congress didn't choose to pursue that known and readily available approach here. And its choice"—to require executions to be carried out according to state, not federal, law—"must be given effect rather than disregarded." *SAS Institute*, 138 S. Ct. at 1356.

Second, the government argues that requiring it to comply with state law would "preclud[e]" it "from selecting *more* humane lethal-injection protocols than those used by the states." Appellants' Br. 29. As explained above, however, section 3596(a), like the 1937 Act, relies on the states, not the Attorney General, to ensure that federal executions are humane. Perhaps circumstances have changed and authorizing the Attorney General to select lethal substances, dosages, and injection procedures would lead to more humane executions. That, however, "is a decision for Congress and the President to make if they wish by enacting new legislation." *Loving v. IRS*, 742 F.3d 1013, 1022 (D.C. Cir. 2014); *see also* Rao Op. at 24. They have ready templates in the nine bills Congress has considered and rejected in the years since the FDPA's enactment, every one of which would have permitted federal

12

executions to be carried out "pursuant to regulations prescribed by the Attorney General." H.R. 2359, 104th Cong. § 1 (1995); *see also* H.R. 851, 110th Cong. § 6 (2007); H.R. 3156, 110th Cong. § 126 (2007); S. 1860, 110th Cong. § 126 (2007); H.R. 5040, 109th Cong. § 6 (2006); S. 899, 106th Cong. § 6504 (1999); H.R. 4651, 105th Cong. § 501 (1998); S. 3, 105th Cong. § 603 (1997); H.R. 1087, 105th Cong. § 1 (1997).

Finally, the government argues that requiring it to follow "every nuance" of state protocols "could impose significant barriers to administering" the federal death penalty. Appellants' Br. 27. Plaintiffs, however, do not contend that the government must follow "every nuance." Quite to the contrary, they argue, and I agree, that section 3596(a) requires the federal government to follow only "implementation" procedures, 18 U.S.C. § 3596(a), which plaintiffs define as those procedures that "effectuat[e] the death," Oral Arg. Rec. 1:01:06, including choice of lethal substances, dosages, vein-access procedures, and medical-personnel requirements, *see id.* 1:01:58–1:05:25. To be sure, plaintiffs' interpretation could present courts with line-drawing challenges: is, for example, color-coding syringes part of effectuating an execution? But here we face no such challenges given that the federal protocol fails to account for state procedures that are obviously integral to "implement[ing]" a death sentence, 18 U.S.C. § 3596(a).

In any event, if crafting a federal protocol consistent with the FDPA proves too difficult, then the Attorney General may, pursuant to section 3596(a), arrange for plaintiffs to be executed by the relevant states—just as most federal prisoners have been since 1937. *See* Oral Arg. Rec. 1:38:13–34 (plaintiffs' counsel acknowledging as much). The government fears that states could "block implementation of a federal death sentence," Appellants' Br. 28, but at oral argument government counsel assured us that the government has no evidence of state

13

recalcitrance in this case, *see* Oral Arg. Rec. 18:50–55 (responding "no" to the question whether there "is any evidence of" "obstructionism" "in this case"). And if such problems do come to pass—that is, if section 3596(a)'s incorporation of state procedures creates obstacles for federal executions—then Congress will have all the more reason to revise the statute. Until it does, this court must enforce section 3596(a) as written. "[I]t is never our job to rewrite . . . statutory text under the banner of speculation about what Congress might have done had it faced a question that, on everyone's account, it never faced." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017).